# United States Tax Court

164 T.C. No. 6

RANCH SPRINGS, LLC, RANCH SPRINGS INVESTORS, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 11794-21.                        Filed March 31, 2025.

————

P is the tax matters partner of LLC, which claimed on its 2017 return a charitable contribution deduction for a conservation easement donation. The easement was granted upon rural land in Shelby County, Alabama. The property was zoned A–1 Agricultural, which permitted agricultural and light residential use only.

LLC had acquired the land for $6,500 per acre in December 2016. In December 2017 an appraiser hired by LLC valued the land at $236,673 per acre, asserting that its highest and best use (HBU) was limestone mining. Relying on this appraisal, LLC on its 2017 return claimed a charitable contribution deduction of $25,814,000 for a qualified conservation contribution under I.R.C. § 170(h).

R commenced an examination of LLC's return, disallowed the charitable contribution deduction in its entirety, and asserted penalties. R issued P a Notice of Final Partnership Administrative Adjustment, and P timely petitioned this Court.

*Held*: The transaction by which LLC acquired the property in December 2016 occurred at arm's length between a willing seller and a willing buyer, both with

**Served 03/31/25**

reasonable knowledge of relevant facts and neither being under any compulsion to buy or sell. The per-acre price upon which the parties agreed, $6,500, provides very strong evidence as to the fair market value of the property before the easement was granted.

*Held, further*, P failed to establish that the HBU of the property before the granting of the easement was limestone mining. The property was zoned A–1 Agricultural and P failed to prove that rezoning to permit mining use was reasonably probable.

*Held, further*, assuming arguendo that limestone mining was a permissible use, the version of the income method P's experts used to determine the "before value" of the property is erroneous as a matter of law because it equates the value of raw land with the net present value of a hypothetical limestone business conducted on the land. A knowledgeable willing buyer would not pay, for one of the assets needed to conduct a business, the entire projected value of the business.

*Held, further*, the "before value" of the property was $720,500, or $6,550 per acre, as determined by R's expert using the comparable sales method. Subtracting from the "before value" the property's conceded "after value," or $385,000, the value of the easement was $335,500.

*Held, further*, because the claimed value of the easement exceeded the correct value by 7,694%, LLC is liable for a 40% penalty for a gross valuation misstatement under I.R.C. § 6662(h).

––––––––––

*Simon P. Hansen*, *Anthony J. DeRiso III*, *Charles E. Hodges II*, *Darianne DeLeon*, and *Jeffrey A. Kaplan, Jr.*, for petitioner.

*Brett Chmielewski*, *Maria S. de Sam Lazaro*, *Anna L. Boning*, *Rishi K. Jain*, *Eric R. Skinner*, *Justin D. Scheid*, *Casey N. Epstein*, and *Sarah M. Raben*, for respondent.

LAUBER, *Judge*: This is a syndicated conservation easement (SCE) case, with a fact pattern that has become painfully familiar. In December 2016 Ranch Springs, LLC (Ranch Springs), purchased 110 acres of farmland in rural Alabama for $715,000, or $6,500 per acre. That approximated the going rate for similar property in the neighborhood during 2014–2020.

One year and six days later, Ranch Springs granted a conservation easement over the property. On its Federal income tax return for 2017, it claimed for this donation a charitable contribution tax deduction of $25,814,000. It asserted that the "before value" of the farmland—i.e., the value of the land before being encumbered by the easement—was $236,673 per acre. It thus took the position that the land had appreciated by 3,641% in 12 months.

The appraisal accompanying the return, prepared by Claud Clark III, asserted that the "highest and best use" (HBU) of the farmland was development as a limestone quarry. To value the easement, Mr. Clark hypothesized—and discounted to present value—the cashflow that supposedly could be derived from operating a limestone quarry on the property for 35 years. He opined, in other words, that the value of the raw land was equal to the assumed value of the hypothetical mining business.

The property's zoning classification permitted only agricultural and light residential use. Petitioner failed to establish a reasonable probability that the land could be rezoned to permit use as a limestone quarry. Because mining was not a legally permissible use, it was not the property's HBU.

Assuming arguendo that rezoning approval could have been secured, petitioner failed to prove that a limestone quarry would have been financially feasible, given the laws of supply and demand. In any event, the appraisal methodology implemented by Mr. Clark is wholly illogical and erroneous as a matter of law. No rational buyer with knowledge of all relevant facts would pay, for one asset needed to operate a business, the entire future value of the business.

We conclude here, as we did in *J L Minerals, LLC v. Commissioner*, T.C. Memo. 2024-93, at *3, that the valuation of the conservation easement "was an outrageous overstatement," wholly untethered from reality. Employing the comparable sales method, as backstopped by the price actually paid to acquire the property in December 2016, we find

that its "before value" was $6,550 per acre and that the value of the easement was $335,500. Because the value claimed on Ranch Springs' return ($25,814,000) exceeded the value of the easement by 7,694%, Ranch Springs is liable for the 40% gross valuation misstatement penalty. *See* § 6662(a), (h).[1]

## FINDINGS OF FACT

The following facts are derived from the pleadings, five Stipulations of Facts with attached Exhibits, one oral stipulation on the record, numerous trial Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial. Ranch Springs is an Alabama limited liability company (LLC) classified as a TEFRA partnership for its short taxable period ending December 31, 2017.[2] Petitioner, Ranch Springs Investors, LLC, its tax matters partner (TMP), had its principal place of business in Georgia when the Petition was timely filed.

Several of the fact witnesses petitioner called were friends, acquaintances, or business associates of Thomas (Tom) and Robert (Bob) Lewis, the prime movers behind the SCE transaction. Other witnesses had invested in SCE deals and thus had a direct or indirect stake in the outcome of this case. While generally showing good recall of many facts from the 2016 and 2017 period, they sometimes expressed inability to recall certain facts about matters that might be regarded as unhelpful to petitioner's position. Because of these witnesses' selective inability to recall pertinent facts, the Court has been required to make credibility determinations.

## I. *The Sun Valley Tract*

Harpersville is a small town in Shelby County, Alabama. It is a largely rural community about 30 miles southeast of Birmingham. Its population at times relevant to this case was about 1,700. One witness

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[2] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit process for many partnerships, including Ranch Springs.

compared it to Mayberry, the fictional setting of *The Andy Griffith Show*, where "everybody knows everybody."

Jason Carpenter is an experienced businessman who originally worked in the tobacco industry. In 2012 he and his wife decided to venture into the cattle business. They purchased 88 acres of land in Harpersville. That sale closed in March 2012 for $627,200, or $7,127 per acre. The Carpenters intended to use the land for cattle grazing.

The Carpenters decided to put their cattle business into an LLC. In December 2013 they formed Sun Valley Farms, LLC (Sun Valley), for that purpose. On January 31, 2014, Sun Valley purchased another 105 acres, adjacent to the tract the Carpenters already owned, for $517,500, or $4,929 per acre. Four days later the Carpenters contributed the 88-acre tract to Sun Valley. As of February 2014 Sun Valley thus owned 193 acres of contiguous farmland in Harpersville (Sun Valley Tract).

The Sun Valley Tract was surrounded by agricultural and residential property. Several homes were directly adjacent to it. It was bounded on one side by Sun Valley Road, which passed by 50–60 residences and numerous farms. On its other side the Sun Valley Tract had frontage along Highway 280, which abuts Ranch Road. Highway 280 is a major four-lane highway that connects Birmingham with points south. The approximate location of the Sun Valley Tract—referred to on this map as the Ranch Springs property, which was carved from it—is shown below:



FIGURE 1.1
GENERAL LOCATION MAP
Showing
RANCH SPRINGS PROPERTY
Shelby County, Alabama
Prepared For
JONES DAY
John T. Boyd Company
October 2023
Scale 1" = 2 Miles

Approximately 20 acres of the Sun Valley Tract were characterized as "farmland of statewide importance." Another 88 acres consisted of "prime farmland." At all relevant times, the property was zoned "A–1 Agricultural," a zoning category that permitted agricultural and light residential use only.

The Carpenters grazed cattle on the Sun Valley Tract starting in 2012. Mr. Carpenter assiduously maintained the property, and he frequently encountered chunks of limestone when using his agricultural equipment. Limestone outcroppings were plainly visible at multiple locations on the property.

II.  *The Lewis Brothers*

Tom and Bob Lewis are longtime Alabama residents with lifelong experience in the coal mining business.  Tom Lewis, who testified at trial, studied geology and began working at Birmingham Coal & Coke (BCC) in 1978.  He and his brother built their careers at BCC, which operated surface mines and supplied much of its coal to an Alabama electric utility.

In 2009 the Lewis brothers were approached by Tim McCollum with a different sort of business proposition.  Mr. McCollum had just purchased, at a bank foreclosure sale, the Meadows property, an 18-hole golf course in Harpersville.  It was situated on Highway 280 near the Carpenters' property.  Jason Rudakas, Tom Lewis's son-in-law, stated that the golf course was "right across the road" from the Sun Valley Tract.  Another witness estimated that it was a quarter of a mile away.

The Meadows property consisted of 200 acres.  Mr. McCollum paid $750,000, or $3,750 per acre, for it.  Needing help to finance the acquisition, he approached the Lewis brothers about a partnership or joint venture, to which they agreed.

The Lewis brothers evaluated several options for developing the golf course property.  They allegedly considered a residential development but concluded that the market for that many homes did not exist.  They considered some sort of sports complex that would include athletic fields.  They ultimately rejected these options and commissioned a report from Bhate Geotechnical Engineering (Bhate) to investigate the property's potential for development as a limestone quarry.  Bhate drilled 3 boreholes on the 200-acre property.  On the basis of the drilling results, Bhate asserted that the golf course would be worth $41 million if developed as a limestone mine.

The Lewis brothers had some experience with limestone and aggregates.  They had mined limestone at their coal mine sites, and they used aggregates in their coal mine reclamation projects.  Owing in part to utilities' diminished appetite for coal, BCC was undergoing financial stress around this time, and it eventually filed for bankruptcy in 2015.  Given their surface mining experience and ownership of the necessary mining equipment, pursuing an opportunity to mine aggregates appeared to be a logical step to diversify their business away from coal.

Indeed, Tom Lewis testified that he and his brother "wanted to move into the limestone [mining] business in [Shelby County]."[3]

Notwithstanding their alleged desire to move into the limestone mining business in Shelby County, and notwithstanding the Bhate report's assertion that a limestone quarry on the Meadows property might be worth $41 million, the Lewis brothers did not pursue this limestone mining opportunity. According to Tom Lewis, the opportunity did not work out "timing wise" with their efforts to exit the coal business.

Instead, the Lewis brothers donated the golf course to the Town of Harpersville and claimed charitable contribution deductions on their tax returns, using the Bhate report to support the deductions claimed. Tom Lewis said he could not remember the total amount of the deductions they reported, but he thought it was less than $41 million.

When the Town acquired the golf course, the property had been derelict for several years and was overgrown with weeds. The Town and/or its lessee spent more than $1 million rehabilitating the property. The Meadows golf course eventually reopened during the administration of Mayor Don Greene, who was elected in 2016. He viewed the reopening of the golf course as a major achievement of his (and the prior mayor's) administration. The Town of Harpersville owned the golf course during 2016 and 2017 and continues to own it today.

III.   *Negotiations for Purchase of the Ranch Springs Property*

In 2016 the Carpenters decided to list most of the Sun Valley Tract for sale. On July 16, 2016, Judy Naugle, a realtor representing the Carpenters, listed 175 acres—90% of the Tract—on the Multiple Listing Service (MLS). The acreage was listed as three separate parcels: a 25-acre and a 45-acre parcel, each priced at $7,500 per acre, and the original 105-acre parcel, priced at $7,013 per acre. These listing prices were determined by analyzing the prices at which nearby properties had recently been sold. The Carpenters intended to retain the residual

---

[3] Mr. Rudakas expressed the view that, during 2016 and 2017, limestone mining was a more attractive business than coal mining because (1) limestone mining was much less heavily regulated; (2) permits for coal mining had to be renewed every 5 years, as opposed to 60 years for limestone; (3) limestone could be profitably extracted from much shallower mines; and (4) the coal business was under economic stress whereas the aggregates business was allegedly booming.

18 acres, which included their personal residence and a residence that they used as rental property.

In late August 2016 Bob Lewis approached Ms. Naugle about the MLS listing for the Sun Valley Tract. He and Mr. Rudakas met with Ms. Naugle and the Carpenters during the first week of September. Mr. Lewis informed them of his belief that the Sun Valley Tract had the potential for development as a limestone mine. "Knox Group" limestone, which underlies the Sun Valley Tract, is very common throughout the region. There is nothing special or unique about the limestone on the Sun Valley Tract. Surface mapping shows that this limestone formation covers almost all of Shelby County.

During a subsequent meeting to discuss possible acquisition of the property, Bob Lewis brought out a geological map and showed Mr. Carpenter the seams of limestone that underlay the property. Mr. Carpenter credibly testified that Mr. Lewis emphasized "the value of the limestone" during this meeting. Mr. Lewis indicated that he intended to speak with (or had already spoken with) the Mayor of Harpersville about opening a limestone quarry.

Although emphasizing the limestone potential of the Sun Valley Tract, Messrs. Lewis and Rudakas suggested that an attractive, tax-advantageous, alternative would be to place a conservation easement on the land. They explained that a partnership could be formed to exploit this opportunity. They proposed that the Carpenters contribute a portion of the Sun Valley Tract to the partnership in exchange for cash and a partnership interest.

On September 6, 2016, Mr. Rudakas sent Mr. Carpenter, and asked him to sign, a draft "membership interest purchase agreement" (MIP agreement) for such a partnership. At a later date Mr. Carpenter was given an organizational chart for the proposed venture. The organizational chart resembled those used in many SCE transactions.

Mr. Rudakas and the Lewis brothers preferred that Mr. Carpenter participate as a partner in the proposed SCE venture, as opposed to selling the land to them outright, for at least two reasons. First, the partnership could then tack onto the Carpenters' holding period for the land, and it could thus consummate an SCE transaction in 2016, rather than having to hold the land for a year to qualify for long-term capital gain treatment. *See* §§ 1231(a)(3)(A)(i), (b)(1), 1223(2). Second, if the Carpenters contributed rather than sold the land, the partnership would

not have to pay cash up front and wait a year to get reimbursed by investors.

Draft iterations of the MIP agreement indicated that the Carpenters might receive as much as $7,000 per acre for the Sun Valley Tract, roughly equal to their asking price. But Mr. Rudakas explained that a one-year holding period for the land would impose some risk on the partnership. For that reason, the price the partnership would be willing to pay might be reduced if the Carpenters declined to join as partners.

Mr. Carpenter sought advice about this proposal from his lawyer, his accountant, and "a friend who conserved property in the past." On September 15, 2016, Mr. Carpenter emailed Mr. Rudakas and thanked him "for taking the time Tuesday to help me better understand the process of the Conservation Easement and how it would relate to the property." But "based on the guidance and advice" that he and his wife had received, they declined to participate in the proposed SCE venture.

After a 6-week quiet period, Mr. Rudakas reopened the negotiations in November 2016. During November and December he negotiated intensely with Mr. Carpenter and Ms. Naugle. Numerous versions of an MIP agreement were exchanged with a view to addressing the Carpenters' concerns. These drafts were reviewed and marked up by Mr. Carpenter's attorney.

On December 6, 2016, Ms. Naugle emailed Mr. Rudakas at the Carpenters' direction and reconfirmed their decision not to participate in any form of SCE venture. She explained that "the current proposed purchase/partnership transaction will not satisfy the concerns [the Carpenters] have regarding potential liabilities." She informed Mr. Rudakas that the Carpenters wished "to do a straight out purchase of the property," acknowledging their awareness that "this may change the price that you are willing to pay."

Mr. Rudakas finally acquiesced to the Carpenters' proposal for an outright sale. But he insisted that the Carpenters execute a "drilling access agreement" authorizing exploratory drilling on portions of the Sun Valley Tract. Mr. Rudakas made clear that the sale could not close until exploratory drilling on the Tract had been completed and the drilling results analyzed. The parties had extensive discussions regarding the exact number of acres that would be purchased. Mr. Carpenter understood that the acreage purchased needed to be sufficient to satisfy the requirements for a limestone quarry.

On December 6, 2016, the parties executed a contract whereby Red Mountain Resources, LLC (Red Mountain), agreed to purchase "122+/− acres" of the Sun Valley Tract for $793,000, or $6,500 per acre. Red Mountain was controlled by the Lewis brothers. The contract was later revised to specify the purchase of only 110 acres, but at the same per acre price of $6,500.

The revised contract substituted Ranch Springs for Red Mountain as the buyer. Ranch Springs had been formed in October 2016. Its initial members were the Lewis brothers, their children, and Yellowhammer Developments (Yellowhammer). The members of Yellowhammer were Mr. Rudakas and Brian Lewis, Bob Lewis's son.

Sun Valley executed the drilling access agreement on December 7, 2016. The exploratory drilling was conducted between December 7 and 13. The drilling was supervised by AquaFUSION, Inc. (AFI), which later prepared a report addressing the feasibility of operating a limestone quarry on the property.

On December 22, 2016, Ranch Springs purchased the 110-acre parcel from Sun Valley for $715,000, or $6,500 per acre. This parcel consisted of 100 acres from the Carpenters' 105-acre tract and 10 acres from their 88-acre tract. We will refer to this 110-acre parcel—on which a conservation easement was granted one year and six days later—as the Ranch Springs Property.

During negotiations for purchase of the Ranch Springs Property, Mr. Rudakas assured Mr. Carpenter that the partnership "wouldn't be doing anything with the land" and that Sun Valley could lease it back for cattle grazing on a year-to-year basis. For several years after the purchase, Sun Valley did in fact lease the Ranch Springs Property (then subject to a conservation easement) for cattle grazing. The Carpenters continued to reside on the remainder of the Sun Valley Tract until 2022, when they sold it to a farmer for about $6,000 per acre.

IV.  *AFI's Exploratory Drilling on the Sun Valley Tract*

AFI drilled 10 holes on the property. Nine of these holes were made using "air-rotary drilling." Air-rotary drilling causes small chips of subsurface material to be blown up and out of the drill hole, enabling the chips to be collected for examination. Air-rotary drilling is considered preliminary, because the chips collected are not necessarily representative of the subsurface material because of the potential for sample

mixing and contamination.  We will refer to the 9 drillholes created by air-rotary drilling as "boreholes."

"Diamond core drilling" is a more reliable (and expensive) exploratory technique.  It enables the exploration team to recover a solid cylinder of subsurface material from the top to the bottom of the drillhole.  We will refer to drillholes created by diamond core drilling as "coreholes."

AFI drilled only one corehole on the Ranch Springs Property.  The single corehole was drilled to a depth of 225 feet, and only 210 feet of subsurface material were recovered for testing.  In its feasibility analysis, AFI nevertheless presupposed a quarry pit that was 385 feet deep.

Exploratory drilling provides data, not only about subsurface minerals, but also about "overburden," i.e., commercially worthless material on top of the mineral layer.  Overburden must be removed, transported, and stored to gain access to the minerals below.  The greater the overburden, the higher the quarry's operational costs would be.  Exploratory drilling also provides data about the subsurface presence of Athens shale, undesirable material that must be removed and cannot be considered part of the limestone mineral resource.

AFI's 10 drillholes revealed overburden varying in depth between 8 feet and 80.5 feet.  The depth and thickness of the overburden increased rapidly toward the easternmost portion of the Sun Valley Tract.  Three boreholes encountered Athens shale.  Athens shale also appeared in at least two visible outcroppings on the Tract, in areas where AFI chose not to drill.  AFI proposed storing this overburden and deleterious material on the northern edge of the Ranch Springs Property along highway 280, in a pile up to 75 feet high.

V.    *Land Prices in Shelby County*

Whenever real property is sold in Shelby County by recorded deed, the Office of the Shelby County Property Tax Commissioner (Tax Office) receives a copy of the deed.  According to its records, 64 large parcels of vacant land (i.e., parcels consisting of 45+ acres) were sold in arm's-length transactions between October 2014 and September 2020.  The median sale price for these parcels was $4,253 per acre, and the average sale price was $6,935 per acre.  The highest price paid during this 6-year period was $35,320 per acre, for a 47-acre parcel of timberland sold in March 2018.

Della Pender has been a realtor in Harpersville since 1991. In her experience, parcels of agricultural land comparable in size to the Ranch Springs Property typically sold during 2017 for $3,500 to $4,500 per acre. The highest price she could recall having been paid for agricultural land in Harpersville was $8,500 per acre. That price was paid for an 80-acre tract with frontage along Highway 280, which was purchased by a developer for use as a residential subdivision.

In December 2015 Locust Creek, LLC (Locust Creek), purchased a 177-acre tract in the neighboring town of Vincent, Alabama, roughly 3 miles from the Ranch Springs Property, for $825,000, or $4,661 per acre. Locust Creek was owned by the Lewis brothers and Mr. Rudakas. They allegedly believed that the HBU of the Locust Creek tract was limestone mining. Instead, they granted a conservation easement on the property, which they valued for charitable contribution purposes at $24,907,471. *See Locust Creek LLC v. Commissioner*, No. 13011-20 (T.C. filed Nov. 9, 2020).

In December 2016 Bradford Resources, LLC (Bradford Resources), acquired a 151-acre tract in Harpersville, roughly 3 miles from the Ranch Springs Property. As confirmed by the RT–1 form that accompanied the deed, the market value that the Tax Office placed on the Bradford Resources parcel was $647,320, or $4,294 per acre.[4] Bradford Resources was owned by the Lewis brothers and Mr. Rudakas. They allegedly believed that the HBU of the Bradford Resources tract was limestone mining. Instead, they granted a conservation easement on the property, which they valued for charitable contribution purposes at $24,874,151. *See Bradford Resources LLC v. Commissioner*, No. 13012-20 (T.C. filed Nov. 9, 2020).

In December 2016 Tanyard Farms, LLC (Tanyard Farms), acquired a 138-acre tract in Harpersville, roughly 3 miles from the Ranch Springs Property. As confirmed by the RT–1 form that accompanied the deed, the market value that the Tax Office placed on the Tanyard Farms parcel was $556,808, or $4,049 per acre. Tanyard Farms was owned by the Lewis brothers and Mr. Rudakas. They allegedly believed that the HBU of the Tanyard Farms tract was limestone mining. Instead, they granted a conservation easement on the property, which they valued for

---

[4] The RT–1 form is a sales validation document used to determine the transfer tax associated with a transfer of real property. This form must be submitted to the Tax Office with the deed if the deed does not indicate the value of the property transferred.

charitable contribution purposes at $24,612,000. *See Tanyard Farms, LLC v. Commissioner*, No. 11216-21 (T.C. filed June 14, 2021).

In December 2016 Sunnydale Springs, LLC (Sunnydale Springs), acquired a 190-acre tract in Harpersville, roughly 3 miles from the Ranch Springs Property, for $850,000, or $4,474 per acre. Sunnydale Springs was owned by the Lewis brothers and Mr. Rudakas. They allegedly believed that the HBU of the Sunnydale Springs tract was limestone mining. Instead, they granted a conservation easement on the property, which they valued for charitable contribution purposes at $23,701,000. *See Sunnydale Springs, LLC v. Commissioner*, No. 14479-23 (T.C. filed Sept. 11, 2023).

In October 2014 Lhoist North America (Lhoist) purchased two parcels of undeveloped land, totaling 240 acres, in Calera, within Shelby County, about 29 miles southeast of Harpersville. As of 2017 Lhoist was the ninth largest producer of aggregates in the United States. For several years it had operated the O'Neal quarry in Calera; in 2017 that quarry produced about 5.5 million tons of limestone. Lhoist paid $2.56 million, or $16,000 per acre, for the 160-acre parcel it acquired in October 2014. It paid $1.44 million, or $17,976 per acre, for the 80-acre parcel it acquired concurrently.

In November 2017 Town Creek, LLC (Town Creek), purchased a 93-acre parcel in Calera for $600,000, or $6,452 per acre. Town Creek was owned by the Lewis brothers and Mr. Rudakas. In 2019 Town Creek donated the property to a foundation, reporting that the parcel was worth $26.95 million, or $289,775 per acre.

VI.   *Possibility of Rezoning the Ranch Springs Property*

Because the Ranch Springs Property, like the rest of the Sun Valley Tract, was zoned "A–1 Agricultural," Ranch Springs would have had to secure rezoning approval to use the 110-acre parcel as a limestone quarry. Ranch Springs owned the property throughout calendar year 2017. But at no point did it file an application with the Town of Harpersville seeking to have the property rezoned. And that was so even though the Lewis brothers supposedly believed that a rezoning application would be viewed favorably.

Rather than file a rezoning application, Mr. Rudakas asked an Atlanta law firm, Bloom Parham (Bloom firm), to address the possibility of rezoning. In a letter dated April 25, 2018, the Bloom firm concluded: "[W]e think there is a reasonable probability that the Property can be

rezoned to M–1 [Industrial] and issued a special exception that allows for mining, as long as there is not strong neighbor opposition to the mining request."[5]

The Bloom letter explained the process for rezoning requests in Harpersville. Because the Town did not have a zoning classification that explicitly permitted mining, the landowner would have to go through a two-step process. First, he would need to secure approval from the Harpersville Planning and Zoning Commission (Zoning Commission) to change the zoning classification from Agricultural to M–1 Industrial.

Upon receipt of a rezoning application, the Zoning Commission would post notices about the proposed change and directly notify neighbors who owned land near the property sought to be rezoned. If the Zoning Commission approved the change after a public hearing, the application would then go to the Town Council, which would make the final decision. The mayor cannot unilaterally approve a zoning change, although he would have a vote as a member of the Town Council.

If the Town Council approved the zoning change after a public hearing, the landowner would then have to go the Harpersville Board of Adjustment (Board) to secure approval for a "special exception." The Board would consider whether the proposed mining use was "compatible" with the M–1 Industrial classification, and it might hold another public hearing before making its decision. If the Board deemed the mining use "compatible," it could approve a "special exception" allowing the mining use.

The Bloom letter concluded that "the rezoning/special exception process is highly political and will turn on neighbor support/opposition." Because the Town had no specified criteria governing the evaluation of rezoning requests, the process would be "influenced heavily by the amount of support or opposition by neighbors of the subject Property." The Bloom firm spoke with Mayor Greene, whose term began in November 2016. He "emphasized the political nature of the [rezoning] decision (i.e., neighbor support/opposition is the driving factor)."

The Bloom letter explained that similar considerations would drive any request for a "special exception." The Town's zoning ordinance provided that the Board could approve a zoning modification only upon

---

[5] The letter did not mention that a conservation easement had been granted on the Ranch Springs Property in December 2017, which would have precluded its conversion to mining use in April 2018, when the letter was drafted.

determining that the proposed use "will not tend to impair the health, safety, convenience or comfort of the public, including that portion of the public occupying the property immediately contiguous to the parcel of land which the modification concerns." According to the Bloom letter, the Board's analysis would thus "focus[] on the health, safety, convenience, and comfort to the public, specifically with respect to immediately neighboring parcels of land." The letter noted that the western edge of the Ranch Springs Property "abuts several properties zoned R–1 Residential. It will be imperative to get these neighbors' support during the rezoning/special exception process."

Neither Ranch Springs nor its agents did any outreach to immediate neighbors or other Harpersville residents during 2016–2018 to gauge the level of community support for (or opposition to) a limestone quarry. The Bloom firm likewise conducted no investigation of this kind. It interviewed the Town Clerk and Mayor Greene, who served as Mayor from November 2016 through October 2020. Both indicated that fair consideration would be given to any rezoning request. But they would provide no assurance about the fate of such a request, emphasizing that the outcome "would be heavily influenced by whether or not neighboring property owners oppose the request."

Given these noncommittal responses, the Bloom letter placed fairly strong reliance on a September 6, 2016, letter signed by Theo Perkins. Mr. Perkins served as Mayor of Harpersville from 2004 through October 2016 and is also its current mayor. Mr. Rudakas supplied this letter to the Bloom firm.

The September 6, 2016, letter is addressed to "Strategic Red Mountain, LLC, c/o Robert Lewis." The letter stated the author's understanding that "Strategic Red Mountain, LLC is interested in purchasing a controlling interest in a company who owns a tract of land" and was "intent on using the Property for mining limestone." The letter states that the tract of land to which it referred was shown on a map "attached as Exhibit A." The letter says that, "if requested by you or the current owners, the City would certainly approve a rezoning, special use, or conditional use to allow mining in these properties [sic]."

Mayor Perkins testified very credibly at trial. Besides serving as Harpersville's current mayor, he is a pastor of the Liberty Christian Church. He explained that Bob Lewis drafted the September 6, 2016, letter and requested that he (the mayor) sign it. Mayor Perkins explained that, in stating that Harpersville "would certainly approve a

rezoning," he meant only that the Town would give fair and open-minded consideration to a rezoning request.

The Bloom firm appended to its report a copy of the September 6, 2016, letter bearing Mayor Perkins's signature. But the copy thus appended did not include an "Exhibit A," which would have identified the property to which the author was referring. At trial Mayor Perkins testified that the property map attached as Exhibit A to the letter he signed was not a map of the Ranch Springs Property, but rather was a map of the Tanyard Farms property (also called the Tanyard Dairy property), in which the Lewis brothers and Mr. Rudakas also had an interest.[6] In other words, Mayor Perkins testified that the letter he signed addressed a possible rezoning of the Tanyard Farms property. He could not recall a meeting that involved a discussion of the Ranch Springs Property, to which he referred as the "Carpenter property."

Mr. Rudakas testified after Mayor Perkins had completed his trial testimony. Mr. Rudakas testified that Bob Lewis wrote the letter in question and that he (Mr. Rudakas) typed it up. Mr. Rudakas then allegedly printed out four identical copies of the letter, one for each of four properties (including Ranch Springs and Tanyard Farms) in which the Lewis brothers were interested. Although the Town of Harpersville letterhead appears at the top of the letter, Mayor Perkins had testified that this was not the letterhead the Mayor's office used in 2016. Mr. Rudakas said that he "must have created the letterhead," seeking to replicate its font and style when typing up Mr. Lewis's draft on his computer.

The copy of Mayor Perkins's letter that was supplied to the Bloom firm and Mr. Clark did not include an Exhibit A. Mr. Rudakas admitted that he did not preserve any copy of the letter with an Exhibit A attached. After searching his files, Mr. Rudakas could find only one copy of the letter, with no Exhibit. Petitioner was unable to produce at trial any copy of the September 6, 2016, letter with an Exhibit A attached.[7]

---

[6] Tom Lewis acknowledged that he had participated in a partnership with an interest in the Tanyard Farms property. A conservation easement was eventually granted on that property, and the appraisal was based on the assumption that limestone mining was its HBU. *See supra* pp. 13–14.

[7] In early 2018 Tom Lewis met with Mayor Greene, who succeeded Mr. Perkins as mayor, to discuss possible rezoning of land in Harpersville for use as limestone quarries. On June 1, 2018, Mayor Greene sent the Lewis brothers a standard letter

At trial respondent called as witnesses two members of the Zoning Commission who held office during 2016 and/or 2017. Ms. Pender (the realtor mentioned earlier) is a lifelong resident of Harpersville and has served on the Zoning Commission since 2005. She inherited her parents' home, which is on a tract 300 feet from the Ranch Springs Property. Her sister owned a 2-acre parcel that abutted the Ranch Springs Property.

Ms. Pender stated her belief that most members of the Harpersville community would have opposed a limestone quarry on the Sun Valley Tract. She explained that most homes in Harpersville relied on shallow wells for their drinking water. Concerns about contamination of the water supply, and about deleterious runoff into the Coosa River 2 miles south of the Town, would have been at the top of residents' worry list. She believed residents would likewise be concerned about traffic congestion on local roads from trucks hauling aggregate. She credibly testified that she, as a member of the Zoning Commission, would have voted against a proposal to rezone the Ranch Springs Property for use as a quarry.

Dale Glasscock is the largest landowner in Harpersville, owning roughly 11% of the total acreage within the Town limits. His property is less than half a mile from the Ranch Springs Property, extending roughly two miles south all the way to the Coosa River. He was appointed to the Zoning Commission in 2017 by Mayor Greene and remained a member of the Commission at the time of trial.

Mr. Glasscock credibly testified that, to his knowledge, no one had ever submitted an application to rezone land in Harpersville for use as a quarry. If such a request were submitted, he believed that the public hearing at which the request was considered would be "standing room only." He echoed Ms. Pender's view that residents would be chiefly concerned about damage to their water supply system, traffic congestion, noise, and dust from the quarry operation. More generally, he believed that residents would have viewed a quarry as inconsistent with the "easy [rural] environment" they prized.

Mr. Glasscock explained that the experience of Vincent, the adjacent town, had "educated" Harpersville's residents about the problems a

_____

explaining the rezoning process, noting that the Zoning Commission would "certainly take your request in consideration." Dissatisfied with this response, Mr. Lewis drafted, and asked the mayor to sign, a letter expressing more unequivocal support for rezoning. Mayor Greene refused to sign that letter.

limestone quarry might entail. After a bitter debate that divided that town, the town council had approved rezoning for a quarry to be called White Rock. But the quarry never opened, so the promises of economic development, jobs, and high wages were never delivered. Mr. Glasscock stated that he, as a member of the Zoning Commission, would have voted against rezoning the Ranch Springs Property for use as a limestone quarry. He believed that his position would have been "the consensus of most of the [community]." Mayor Greene echoed that view, explaining that a quarry on the Ranch Springs Property "probably would not be looked on favorably" by nearby property owners.[8]

Petitioner presented no testimony at trial from any current or former member of the Zoning Commission or Board of Adjustment. Petitioner offered no analysis that attempted to gauge the level of neighborhood opposition to (or support for) a limestone quarry. Petitioner's sole evidence on this point consisted of testimony from one former neighbor, Daniel Gardner, who once owned a 100-acre tract adjacent to the Ranch Springs Property. He testified that he would not have opposed a quarry on that site.

We discounted Mr. Gardner's testimony. He was a member of a partnership, Sunrise Valley, LLC, that in 2018 granted a conservation easement on the property he formerly owned, which was half a mile from the Ranch Springs Property on the same road. *See Sunrise Valley, LLC v. Commissioner*, No. 14353-23 (T.C. filed Sept. 7, 2023). The easement was valued at $24.18 million, and the magnitude of the charitable contribution deduction Mr. Gardner (and other investors) were allocated was premised on the theory that the land could have been used as a limestone quarry. For that reason, Mr. Gardner had a personal interest in testifying that the Ranch Springs Property, which was next to his, could have been rezoned to permit limestone mining. Whether or not his testimony was biased, we find that it was unlikely to be representative of the views of Harpersville residents generally.

---

[8] Harpersville residents voiced strong opposition to the proposed rezoning of another property—half a mile down the road from the Ranch Springs Property—for use as a veterans assisted living facility. After residents expressed concerns that the proposed facility would be inconsistent with the use of neighboring properties and bring unwanted noise and traffic, the Zoning Commission voted to deny the rezoning application. It seems reasonable to conclude that residents who considered an assisted living facility for veterans too disruptive for the neighborhood would have opposed a limestone quarry at least as strongly.

VII.   *Permitting Required for a Limestone Quarry*

Apart from rezoning, multiple permits would be needed to operate a quarry on the Ranch Springs Property. Most of the permits would have to be secured from the Alabama Department of Environmental Management (ADEM). These would include an air emission discharge permit, a surface water discharge permit, a National Pollutant Discharge Elimination System permit, and (if groundwater would be affected) an Underground Injection Control permit. For a limestone quarry, ADEM would need to notify the U.S. Environmental Protection Agency and the U.S. Fish and Wildlife Service, and those agencies would conduct their own reviews of the application.

ADEM engages in an extensive technical examination of all permit applications, and it is rare for an applicant to be successful on its first try. Typically there is a back-and-forth process, with ADEM raising questions about the applicant's plans and requesting more information. If ADEM tentatively approves a permit, it normally must provide the opportunity for a public hearing.

ADEM makes its final decision to issue permits only after the public and interagency comment periods have closed and all comments have been considered. ADEM's final decision is subject to an administrative appeals process. AFI admitted in its feasibility study that the "permitting process has become more difficult as public opposition to quarries has intensified."

Ranch Springs never submitted an application to ADEM for any of the required permits. Applicants commonly hire consultants to assist them with the technicalities of this process. But there is no evidence that Ranch Springs engaged a consultant or took any other preliminary steps toward securing permits. Although Ranch Springs held the property throughout 2017, Mr. Rudakas testified that "[w]e weren't ready right at that point to start that process."

The saga of White Rock (the proposed quarry referenced by Mr. Glasscock) shows how lengthy the process can be. *See supra* pp. 18–19. In October 2009 White Rock Quarries, LLC, filed an application to rezone property in Vincent—the town adjacent to Harpersville—for use as a limestone mine. Nine months later, after a bitter fight, the town approved the rezoning application, but that approval was contested in a lawsuit that went all the way to the Alabama Supreme Court. White Rock could not complete the ADEM permitting process until the lawsuit

was concluded, and the necessary permits were not secured until 2019. As of 2024—15 years after the initial rezoning application—the White Rock quarry had not commenced operations.

VIII.  *Existing Supply of Limestone*

In 2017 Shelby County had 7 well-established limestone quarries, which produced more than 10 million tons of limestone that year.  The biggest quarries were operated by Vulcan Materials Co. (Vulcan), the largest producer of construction aggregates in the United States; by Martin Marietta Aggregates, Inc. (Martin Marietta), the second largest producer; and by Lhoist, the ninth-largest producer.  There were nine quarries in neighboring counties, which produced another 5.4 million tons of limestone annually.

A trucking company official knowledgeable about the local market credibly testified that Vulcan and Martin Marietta had a "choke-hold" on the limestone aggregate market in the Shelby County area. And the existing quarries had unused capacity.  Vulcan's Calera quarry, which produced 3.1 million tons of limestone in 2017, typically could sell only 85% of what it could produce.  Vulcan's Childersburg, Alabama, quarry, 12 miles from the Ranch Springs Property, was one of Vulcan's three worst performing quarries in the United States.  Nationwide, Vulcan reported that it was operating at 55% to 60% of capacity in 2015 and "well below full capacity" in 2016.

IX.  *Preparing for and Marketing the SCE Transaction*

In January 2017 Bob Lewis and Mr. Rudakas executed the initial operating agreement for Ranch Springs, for which they served as the original managers.  On August 22, 2017, Mr. Rudakas, acting on behalf of Ranch Springs, engaged James Freeman and Ricky Novak, through several entities they controlled, to assist in implementing an SCE transaction involving the Ranch Springs Property.

Messrs. Freeman and Novak were the managing partners of the Strategic Group of Companies, which included Strategic Capital Partners, LLC (SCP), and Strategic Fund Manager, LLC (Strategic Fund). They were in the business of arranging and helping to market SCE transactions,  performing  functions  commonly  regarded  as  being

performed by "promoters."[9]  Messrs. Freeman and Novak were also registered principals of Bridge Capital Associates (Bridge Capital).

The August 2017 engagement letter stated that SCP and Bridge Capital would offer services to Ranch Springs in three phases.  During Phase 1 SCP would determine the "minimum equity capital" to be raised from investors and the "estimated net proceeds" that the partnership would receive after payment of promoters' fees and transaction costs.  These amounts would be shown in a schedule captioned "Estimated Sources and Uses of Funds," a standard template SCP used for its SCE deals.  After reviewing these numbers, Ranch Springs would decide whether to move to Phase 2, during which SCP and Bridge Capital would develop a strategy for marketing the transaction and drafting a private placement memorandum (PPM) for circulation to potential investors.  Phase 3 would cover the period after the easement was granted.

The promoters recommended an ownership structure that is common to many SCE transactions.  Ranch Springs, which owned the Ranch Springs Property, would serve as the Property Company or "PropCo."  It would eventually be owned by an Investment Company or "InvestCo," and units in the InvestCo would be marketed to investors.  The PropCo would place a conservation easement on the property, and the investors would then receive, through the InvestCo, pro rata shares of the tax deduction that Ranch Springs claimed for the easement.  On August 23, 2017, Ranch Springs Investors (RSI), a Georgia LLC, was organized as the InvestCo, with Strategic Fund (controlled by Messrs. Freeman and Novak) as its manager.

On August 25, 2017, Mr. Rudakas engaged Mr. Clark to perform an appraisal for a proposed conservation easement on the Ranch Springs Property.  Mr. Clark had already agreed to prepare appraisals for three other proposed conservation easements in Harpersville, all on properties owned by the Lewis brothers and/or Mr. Rudakas.  For each project AFI had performed (or was expected to perform) a mining feasibility study, which Mr. Clark would use as the basis for his appraisal.

---

[9] "Promoter" is sometimes viewed as a loaded term in the tax world because of the penalty imposed by section 6700(a) for "promoting abusive tax shelters."  In this Opinion we use the term "promoter" in its ordinary sense, making no determination as to whether the activities of Messrs. Freeman and Novak, or of the entities they managed, would subject them to a civil penalty under section 6700(a), a question that is not before us.

On November 12, 2017, Mr. Novak prepared an "investor allocations" spreadsheet for the InvestCo. This document was intended to track the number of units purchased by investors and the tax benefits each would receive. Even though Mr. Clark had not yet supplied a preliminary appraisal, this spreadsheet showed the "appraised value" of the PropCo (Ranch Springs) as $26.7 million.

On November 14, 2017, Mr. Novak sent emails to 60+ potential investors, attaching a 2-page "offering summary." It estimated that the Ranch Springs SCE transaction would produce a $26.27 million charitable contribution deduction, yielding investors a deduction in excess of $4 for every $1 invested. The offering summary included a "case study" showing how investors could "mitigate [their] effective tax rate and tax payments." Neither the email nor the offering summary mentioned any benefits that might accrue by pursuing a strategy other than a conservation easement.

On November 20, 2017, Mr. Novak emailed employees at Bennett Thrasher (BT), the accounting firm engaged to prepare Ranch Springs' tax returns. BT was concurrently proposing year-end SCE deals to its clients. Mr. Novak informed BT that the Ranch Springs deal would be priced at $30,000 per unit and would generate a total charitable contribution deduction of $26.27 million. The offering would yield a "total capital raise" of $5.7 million and would offer investors a deduction-to-investment ratio of 4.25 to 1.

Mr. Novak asked BT whether he was "correct in assuming [that] the total BT client needs will be similar to last year." Mr. Novak indicated that he would "reduce the BT allocation in Ranch Springs to 30 units"—i.e., to $900,000—for the time being. But he noted that the promoters had 3 other SCE deals expected to close by year-end 2017 and would give BT "bigger allocations in the other 3" if BT had enough demand from its clients.

SCP and Bridge Capital prepared a confidential PPM dated November 30, 2017, offering 180.5 class A membership units in RSI (the InvestCo) at $30,000 per unit. The PPM explained that RSI would use the funds thus raised to purchase units in Ranch Springs (the PropCo). RSI's manager would then recommend to investors whether the partnership should place a conservation easement on the Ranch Springs Property (the "conservation strategy") or develop it as a limestone quarry (the "investment strategy"). Assuming that investors voted for the conservation strategy—as if there were any doubt about this—the

class A units would be allocated a charitable contribution deduction of $24,035,537, or $4.44 for every $1 invested.

X.    *Feasibility Study and Appraisal*

The PPM included an excerpt from a November 29, 2017, "restricted appraisal report" prepared by Mr. Clark. In this report Mr. Clark incorrectly stated that "[t]here have been no sales or transfers of the property in the last three years." He asserted that the HBU of the Ranch Springs Property was a limestone quarry. In positing this HBU, he made the "extraordinary assumption" that "all necessary permits (including those related to zoning) could be obtained to operate a mine on the property."

Asserting that no sales of comparable properties existed, Mr. Clark opined that the "before value" of the Ranch Springs Property should be determined using the income approach. The version of the income approach he used is often called the "owner-operator method." Under this method, the pre-easement value of the land is determined by discounting to present value the cashflows an owner-operator supposedly could derive from conducting a limestone mining business on the property. Mr. Clark thus posited that a prospective owner-operator would pay—for the raw land alone—the entire net present value (NPV) of the hypothetical mining business.

In the case of mineral property, the income approach can also be implemented by using the "royalty income method." This method posits that the landowner would lease the land to a mine operator, then determines the land's pre-easement value by calculating the discounted present value of the royalty income the landowner might receive from the operator. Witnesses from Vulcan credibly testified that Vulcan typically leases mineral property rather than buying it outright. And they indicated that, for aggregates, Vulcan on average pays a royalty of 5% or less, computed on the value of production f.o.b. (free on board) mine.[10]

Mr. Clark admitted that "[c]alculating the present value [of the Ranch Springs Property] using the Royalty Income [method] would result in a substantially lower fair market value . . . , perhaps 1/10th or

---

[10] Witnesses from Vulcan explained that an outright purchase of raw land—commonly called a "greenfield site"—typically requires the mine operator to incur significant debt, which can be undesirable from a balance-sheet perspective. By leasing the land instead, the operator avoids encumbering its balance sheet and incurs royalty expenses that can be written off concurrently with the receipt of mining income.

less of the value obtained" using the owner-operator method. But he asserted that the owner-operator method "is appropriate for this project due to the owner [i.e., the Lewis brothers] living within close vicinity to the property, as well as having the ability to operate the mine, rather than having to hire someone to do so."

Mr. Clark constructed a discounted cashflow (DCF) spreadsheet to calculate the NPV of operating a limestone mining business on the property for 35 years. Assuming incorrectly that the Ranch Springs Property comprised 103 acres, he asserted that its "before value"—that is, its value before the granting of a conservation easement—was $26,034,064. Subtracting from the property's "before value" its assumed "after value" ($206,000), Mr. Clark determined a rounded value of $25,828,000 for the easement.

Mr. Clark premised his appraisal on the "feasibility analysis" for a limestone quarry prepared by AFI and dated November 9, 2017. This analysis was based on geological data yielded by AFI's drilling on the Sun Valley Tract in December 2016, which consisted of drilling 9 boreholes and 1 corehole. *See supra* pp. 11–12. David Buss, the principal author of this report, testified as an expert witness at trial.

Dr. Buss asserted in his report that the Ranch Springs Property had nearly 23.3 million tons of "proven limestone reserves," that a quarry on the property would have a 35-year life, and that 700,000 tons of limestone could be extracted and sold annually after a brief ramp-up period. Using a DCF methodology with a 10% discount rate, Dr. Buss's model asserted that the NPV of the limestone resources (before taxes, interest, depreciation, and amortization) was $38.8 million.

Dr. Buss acknowledged that he had prepared similar "feasibility analyses" for limestone mines on 10 nearby properties in which the Lewis brothers had invested (or in which they were considering investing). These included Bradford Resources, which Dr. Buss estimated to have 21.49 tons of recoverable limestone; Tanyard Farms, which he estimated to have 19.23 tons of recoverable limestone; and DeSoto Holdings, which he estimated to have 19.82 tons of recoverable limestone. *See DeSoto Holdings, LLC v. Commissioner*, No. 13013-20 (T.C. filed Nov. 9, 2020). All three properties were within 3 three miles of the Ranch Springs Property, but Dr. Buss did not take their projected

limestone sales into account when analyzing the market share that a hypothetical quarry on the Ranch Springs Property might secure.[11]

## XI.  *Closing the Deal*

The Ranch Springs offering closed on December 12, 2017, and was fully subscribed.  Sixty-two investors purchased 180.5 class A units in RSI, enabling the offering to reach its target of $5,415,000 ($30,000 × 180.5 = $5,415,000).  RSI paid $1,560,000 to the Lewis brothers and Yellowhammer for a 94% interest in Ranch Springs.  The remaining 6% of Ranch Springs was held by the Lewis brothers, Yellowhammer, and an entity controlled by Messrs. Freeman and Novak.  That same day Ranch Springs amended its operating agreement to name RSI as its manager and TMP.

The next day RSI's manager, Strategic Fund, notified investors that it recommended pursuing the conservation strategy.  Investors were instructed to return, within 5 days, their votes in favor of or against that recommendation.  As far as the record reveals, all investors voted for (or were deemed to have voted for) the conservation strategy.

On December 28, 2017, Ranch Springs granted a conservation easement over the Ranch Springs Property to Heritage Preservation Trust, a section 501(c)(3) entity and a "qualified organization" under section 170(h)(1)(B).  The deed of easement prohibited commercial development of the property but reserved numerous rights to Ranch Springs, including the rights to use the property for agricultural, forestry, and recreational purposes and to build structures within a designated area.

## XII.  *Tax Return and IRS Examination*

Victoria Barry, an accountant at BT, prepared the return for Ranch Springs' short tax year ending December 31, 2017.  The return claimed a noncash charitable contribution deduction of $25,814,000 for the easement.  (It also reported a $58,000 deduction for a cash contribution, which the IRS did not challenge.)

---

[11] Notwithstanding the supposed limestone mining potential of the three properties discussed in the text, conservation easements were granted on all of them.  *See supra* pp. 13–14.  These 3 properties were carved from a larger tract, the Merrell Brothers Farm, which the Lewis brothers and Mr. Rudakas purchased in December 2016 and subdivided.

Ranch Springs attached to its return an appraisal by Mr. Clark, dated April 20, 2018, that valued the easement as of the contribution date. This appraisal was substantially identical to the "restricted appraisal report" he had prepared on November 29, 2017, except that it reflected the property's correct acreage (110 rather than 103 acres). Subtracting from the property's assumed "before value" ($26,034,064) its assumed "after value" ($220,000), Mr. Clark determined a rounded value of $25,814,000 for the easement.

The IRS selected the return for examination and assigned the case to Revenue Agent (RA) Timothy Neighbors. At the conclusion of his examination, RA Neighbors recommended assertion of the 40% penalty for a gross valuation misstatement under section 6662(e) and (h) or (in the alternative) a 20% accuracy-related penalty for a substantial valuation misstatement, a reportable transaction understatement, negligence, or a substantial understatement of income tax. *See* §§ 6662(a) and (b)(1)–(3), (c)–(e), 6662A(b). RA Neighbors's immediate supervisor at the time, Supervisory Revenue Agent Gregory Burris, approved these penalty recommendations. By Order served October 17, 2023, we held that Mr. Burris's approval was timely and that the IRS had satisfied the supervisory approval requirements of section 6751(b)(1).

On March 22, 2021, the IRS issued petitioner a Notice of Final Partnership Administrative Adjustment (FPAA) disallowing in its entirety the deduction claimed for the conservation easement. The FPAA determined that Ranch Springs had not established that it made a contribution or gift in 2017 and had otherwise failed to show that it had satisfied all the requirements of section 170. The FPAA alternatively determined that, if Ranch Springs had complied with applicable regulatory requirements, it had failed to establish that the value of the easement exceeded zero. The IRS determined a 40% penalty for a gross valuation misstatement and (in the alternative) a 20% penalty under the provisions of section 6662 mentioned above. Petitioner timely petitioned for readjustment of partnership items.

XIII. *Tax Court Trial*

    A.    *Petitioner's Experts*

        1.    *Claud Clark*

We recognized Mr. Clark as an expert in real estate appraisal. His direct testimony consisted of a cover letter dated October 24, 2023,

to which he attached a copy of his appraisal dated April 20, 2018. *See supra* pp. 24–25, 27.

### 2. *David Buss*

We recognized Dr. Buss as an expert in geologic investigation, subsurface field investigation, and financial analysis. His direct testimony consisted of a cover letter dated October 27, 2023, to which he attached a copy of the AFI feasibility analysis dated November 9, 2017. *See supra* pp. 25–26.

### 3. *Michael Wick*

Michael Wick is a vice president of John T. Boyd Co., a mining and geological consulting firm. We recognized him as an expert in the mining industry, quarrying operations, mineral reserves, mineral market analyses, and production and distribution. He was retained to perform "a valuation of the limestone underlying the [Ranch Springs Property]." Like Mr. Clark and Dr. Buss, he employed an owner-operator/DCF model to develop "a going concern valuation . . . for the site."

Mr. Wick posited a limestone quarry with a 28-year life. He assumed that the quarry would sell 100,000 tons of limestone in its first year of operation, ramping up to 511,000 tons in year 5, then increasing by 1.7% annually (the estimated rate of population growth). Mr. Wick did not project annual sales of 700,000 tons—the annual volume assumed by Messrs. Buss and Clark—until year 24. Mr. Wick assumed that the hypothetical quarry, after its 5-year ramp-up period, would capture 6% of the aggregates market in Shelby County and the five surrounding counties. On the basis of these assumptions he determined the fair market value (FMV) of "the Ranch Springs Property mineral and associated mining rights" to be $18 million as of December 28, 2017.

### B. *Respondent's Experts*

### 1. *Bart Stryhas*

Dr. Stryhas is a geologist with more than 40 years of domestic and international mining experience. He is employed by SRK Consulting, Inc. (SRK), which has expertise in a wide range of mineral resource and engineering disciplines, with offices in 20 countries on 6 continents. He has audited numerous geologic investigations and exploration projects and is a member of the American Institute of Professional Geologists.

We recognized Dr. Stryhas as an expert in geology, mineral exploration, and mineral resource estimation and classification.

Dr. Stryhas's principal opinion was that the AFI report erred in classifying the limestone underlying the Ranch Springs Property as a "proven limestone reserve." According to Dr. Stryhas, this limestone is properly classified as an "inferred mineral resource," viz., a mineral resource whose quantity and quality is estimated on the basis of limited geological evidence and sampling. As compared to a "proven mineral reserve," an "inferred mineral resource" inspires a relatively low level of geological confidence.

2. *Neal Rigby*

Dr. Rigby is a mining engineer with 49 years of experience in the international mining industry. He was a founding partner of SRK's U.K. division and served as SRK's global chairman for 15 years. He is a member of the Institute of Materials, Mining, and Metallurgy, and the American Institute of Mining, Metallurgical, and Petroleum Engineers. We recognized him as an expert in mineral evaluations, mineral financing, and mineral reporting.

Dr. Rigby agreed with Dr. Stryhas that, given the limited exploratory work AFI had done, the limestone beneath the Ranch Springs Property could be classified only as an "inferred mineral resource." "Inferred resources," he explained, "do not have the completed technical work to demonstrate that the project will be viable." "To be considered a viable mining project," in his view, "the technical work to support Reserves must be completed to the prefeasibility or feasibility level."

Dr. Rigby opined that AFI's technical work—analyzing data from 9 boreholes and one corehole drilled to a depth of 225 feet—did not establish that the Ranch Springs Property could feasibly be exploited as a limestone quarry. Alleging numerous deficiencies in the AFI report, he concluded that "the Ranch Springs project is simply too early stage and the knowledge base too low upon which to base a quarry design and development plan other than on a conceptual basis."[12]

---

[12] Seeking to supplement the modest drilling work AFI had done in 2016, petitioner commissioned additional drilling on the Ranch Springs Property in April 2024. Petitioner sought to call Jim Stroud as a witness to testify about the results of that drilling. By Order served June 13, 2024, we granted respondent's Motion in Limine to

### 3.  *Andrew Sheppard*

Mr. Sheppard has been a licensed commercial real estate appraiser in Alabama and elsewhere for 26 years.  During his career he has appraised 58 mineral properties at various stages of development (including proposed, operating, and depleted mines).  He holds the MAI designation from the Appraisal Institute.  We recognized him as an expert in real estate appraisal.

Mr. Sheppard opined that the Ranch Springs Property should be characterized, for valuation purposes, as an "exploratory stage mineral property."  Citing valuation texts and peer-reviewed articles, Mr. Sheppard concluded that the appropriate methodology for determining the FMV of such property is the sales comparison approach.  He searched for transactions involving similarly sized parcels, where the parties knew that minerals were present, but where no entitlements (such as required zoning and permits) had yet been obtained that would allow the minerals to be mined.

Mr. Sheppard selected three comparable sales.  The first was the Carpenters' sale of the subject property to Ranch Springs for $6,500 per acre in December 2016.  The second was the sale of a 74-acre parcel in Calera for $6,466 per acre in December 2016.  Mr. Sheppard confirmed that there was limestone on this property, that it was located in a "heavily active" quarrying market, and that exploratory drilling had been conducted on the property before the sale.  The third comparable was the sale of a 197-acre parcel in Chelsea, Shelby County, for $6,738 per acre in June 2016.  This property, like the other two, was on a major highway and had visible limestone outcroppings.  Rather than using the property for mining, the buyer decided to develop it into a residential subdivision.

After making appropriate adjustments to these sale prices, Mr. Sheppard concluded that the "before value" of the Ranch Springs Property was $720,500, or $6,550 per acre.  Again employing the comparable sales approach, he determined an "after value" of $385,000 for the property, or $3,050 per acre.  By stipulation in its Posttrial Brief, petitioner

---

exclude Mr. Stroud's testimony.  His proposed report, dated May 17, 2024, consisted of expert testimony, and the Court had set October 27, 2023, as the deadline to exchange and lodge with the Court opening expert reports.  Because the Stroud report was not timely exchanged with respondent, and because it failed in other respects to comply with the requirements of Rule 143(g) governing expert witness reports, we excluded it from evidence.  And because Mr. Stroud's report consisted of expert testimony, we declined to let him testify at trial as a fact witness.

accepts the "after value" determined by Mr. Sheppard. Subtracting the "after value" from the "before value," Mr. Sheppard concluded a value of $335,500 for the easement.

## OPINION

### I. *Burden of Proof*

The IRS's determinations in a notice of deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect to [that] factual issue," § 7491(a)(1), and must have "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A). Petitioner has not satisfied these requirements with respect to any factual issue that has salience in deciding the questions presented. The burden of proof thus remains on petitioner.

### II. *Qualified Appraisal*

Section 170(f)(11) disallows a deduction for certain noncash charitable contributions unless specified substantiation and documentation requirements are met. In the case of a contribution of property valued in excess of $500,000, the taxpayer must obtain and attach to his return "a qualified appraisal of such property." § 170(f)(11)(D). An appraisal is "qualified" if it is "conducted by a qualified appraiser in accordance with generally accepted appraisal standards" and meets requirements set forth in "regulations or other guidance prescribed by the Secretary." § 170(f)(11)(E)(i).

To be a "qualified appraiser," an individual must have "earned an appraisal designation from a recognized professional appraiser organization or ha[ve] otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary." § 170(f)(11)(E)(ii)(I). The individual must "regularly perform[] appraisals for which [he] receives compensation" and meet "such other

requirements as may be prescribed by the Secretary." § 170(f)(11)(E)(ii)(II) and (III).

Respondent agrees that Mr. Clark met most of the requirements listed above at the time he prepared the appraisal attached to Ranch Springs' 2017 return. For two reasons, however, respondent urges that the appraisal was not a "qualified appraisal" prepared by a "qualified appraiser." We reject both arguments.[13]

First, respondent urges that Mr. Clark neglected to follow the Uniform Standards of Professional Appraisal Practice (USPAP) when preparing his appraisal. We have recently held that an appraiser's failure to strictly follow USPAP does not render his appraisal per se "nonqualified." Rather, it is simply a factor to be considered in assessing its persuasiveness. *See Seabrook Prop., LLC v. Commissioner*, T.C. Memo. 2025-6, at *31–32; *J L Minerals*, T.C. Memo. 2024-93, at *36–37; *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at *48–49; *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at *27 n.25. We reach the same conclusion here.

Second, respondent contends that Mr. Clark was not a "qualified appraiser" by virtue of the "Exception" set forth in Treasury Regulation § 1.170A-13(c)(5)(ii). It provides that an individual is not a qualified appraiser with respect to a particular donation "if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property." This will be true, for example, if "the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property." *Ibid.*; *see Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *39–45 (finding that an appraiser was not "qualified" by virtue of this regulation), *supplemented by* T.C. Memo. 2024-73.

As we explain below, we find that that Mr. Clark wildly overvalued the Ranch Springs Property and that his methodology was deficient in many respects. But we are not convinced that Ranch Springs' principals were aware of any facts suggesting that Mr. Clark would "falsely . . . overstate" the value of the easement, which requires a showing of

---

[13] Failure to secure a "qualified appraisal" is not fatal to the allowance of a charitable contribution deduction "if it is shown that the failure to meet such requirement[] is due to reasonable cause and not to willful neglect." § 170(f)(11)(A)(ii)(II). Given our disposition, we need not decide whether petitioner could satisfy this test.

deception or collusion. *See Oconee Landing*, T.C. Memo. 2024-25, at *44–45. The trial produced little or no evidence of either.

Mr. Clark based his appraisal largely on AFI's "feasibility analysis," which estimated the value of the limestone resources on the property at $38.8 million. The Lewis brothers knew that Mr. Clark was relying on AFI's analysis. There is no evidence that the Lewis brothers were aware of facts suggesting that AFI had falsely overstated the value of the minerals. Indeed, the Lewis brothers had received a geological report from Bhate several years previously, which estimated that the golf course across the road would be worth $41 million if developed as a limestone mine. *See supra* pp. 7–8.

In short, in the absence of evidence that Ranch Springs' principals believed AFI's analysis to be false, it is difficult to charge them with knowledge that Mr. Clark's appraisal was false, since Mr. Clark derived the central components of his appraisal directly from AFI's analysis. For purposes of this case, we thus conclude that Mr. Clark was a "qualified appraiser" and that the appraisal attached to Ranch Springs' 2017 return was a "qualified appraisal."

III.  *Valuation*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time of the gift. *See* Treas. Reg. § 1.170A-1(a), (c)(1). The regulations have provided, for a very long time, that the FMV of property for charitable contribution purposes is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* para. (c)(2). Valuation is not a precise science, and the value of property on a given date is a question of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

The FMV of real property should reflect its HBU on the valuation date. *See Mitchell v. United States*, 267 U.S. 341, 344–45 (1925); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). A property's HBU is the most profitable, legally permissible, use for which the property is adaptable and needed, or likely to be needed in the reasonably near future. *Olson v. United States*, 292 U.S. 246, 255 (1934); *Symington v. Commissioner*, 87 T.C.

892, 897 (1986). If different from the current use, a proposed HBU thus requires both "closeness in time" and "reasonable probability." *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985).

To support their positions regarding valuation the parties retained experts who testified at trial. We assess an expert's opinion in light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weight them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment. *Parker*, 86 T.C. at 561. We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts). And we may determine FMV from our own examination of the record evidence. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

"Market prices" typically do not exist for conservation easements. *See Symington*, 87 T.C. at 895; *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at *30. For that reason, courts usually value easements indirectly using a "before and after" approach, seeking to determine the reduction in property value attributable to the easement. *See* Treas. Reg. § 1.170A-14(h)(3)(i); *cf. Browning v. Commissioner*, 109 T.C. 303, 320–24 (1997). Under that approach, the value of the easement is deemed equal to the FMV of the real estate before the easement was granted ("before value"), minus the FMV of the real estate as encumbered by the easement ("after value").

A.  *"Before Value" of the Ranch Springs Property*

1.  *Prior Transactions Involving the Property*

"The best evidence of a property's FMV is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *31; *see Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1233 (1987) ("[T]he price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value." (citing *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 244 (1968), *aff'd per curiam,* 406 F.2d 288 (2d Cir. 1969))); *Estate of Newberger v.*

*Commissioner*, T.C. Memo. 2015-246, 110 T.C.M. (CCH) 615, 616–17 (observing that no evidence is more probative of a donated property's FMV than its direct sale price).  For example, in *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at \*28–29, we found that the most persuasive evidence of a property's FMV was its actual sale price 15 months before the contribution.  *Accord, e.g.*, *Wortmann v. Commissioner*, T.C. Memo. 2005-227, 90 T.C.M. (CCH) 336, 339–40 (finding that the most persuasive evidence of the property's FMV was its actual sale price 17 months before the contribution).

The record here includes persuasive evidence of this sort.  The 110-acre Ranch Springs Property is largely coterminous with the 105-acre parcel the Carpenters purchased in January 2014.  They purchased that parcel (through Sun Valley) for $517,500, or $4,929 per acre.  In July 2016 Ms. Naugle, a realtor representing the Carpenters, listed the 105-acre parcel for sale for $738,500, or $7,013 per acre.  On December 6, 2016, Red Mountain agreed to purchase 122 acres of the Sun Valley Tract for $793,000, or $6,500 per acre.  The contract was later revised to reduce the acreage to 110 acres, with Ranch Springs substituted as the buyer, while retaining the same per-acre price of $6,500.  On December 22, 2016, Ranch Springs purchased the 110-acre parcel from Sun Valley for $715,000, or $6,500 per acre.[14]

Petitioner does not dispute that the Carpenters and Ranch Springs were unrelated parties dealing at arm's length.  But it asserts that $6,500 per acre—the agreed-upon sale price—was not "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  Treas. Reg. § 1.170A-1(c)(2).  First, it contends that the Carpenters were not "willing sellers," having assertedly acted under a "compulsion to sell."  In effect, petitioner asserts that the December 2016 sale was a "distress sale."  Second, petitioner contends that the Carpenters lacked "reasonable knowledge of relevant facts" because they did not know the exact quality and quantity of the limestone underneath their property.

Mr. Carpenter testified very credibly at trial.  He explained that he and his wife decided to sell part of the Sun Valley Tract to raise cash to pay legal fees he had incurred in unrelated litigation.  The couple had

_____

[14] Mr. Clark in his appraisal took no account of this prior transaction, erroneously stating that "[t]here have been no sales or transfers of the property in the last three years."

other assets they could have accessed for this purpose: Mr. Carpenter had an IRA, and his wife had a sizable annuity investment. But an IRA distribution would have been taxed in full as ordinary income, whereas a sale of real estate would generate tax only on the gain. And Mr. Carpenter was reluctant to suggest liquidation of his wife's annuity to satisfy an obligation arising from his personal business activities.

Contrary to petitioner's view, these facts do not show that the Carpenters were under a "compulsion to sell." People often sell assets to raise cash to satisfy their desires or meet their obligations. They may liquidate assets—stocks, bonds, mutual funds, or real estate—to pay for their children's education, to buy a new home, to pay medical bills, or to treat their family to an extended vacation. Selling an asset for such a purpose provides no evidence that the seller is under a "compulsion to sell."

Sellers like the Carpenters typically attempt to raise cash in a tax-efficient manner. If a couple owns two assets worth $1 million, one with a basis of zero and the other with a basis of $800,000, they will often choose to sell the latter to minimize the tax bite. That is exactly what the Carpenters did—after consulting their tax adviser—by selling a portion of the Sun Valley Tract at a modest gain instead of taking a large IRA distribution. After selling the 110 acres to Ranch Springs, the Carpenters retained 83 acres on which they continued to reside.

The December 2016 sale bore none of the earmarks of a "distress sale." Distress sales commonly occur when sellers are forced to sell *when they do not want to sell*, e.g., because market conditions are highly adverse or because they would incur a large loss. *See, e.g.*, *Estate of DeBie v. Commissioner*, 56 T.C. 876, 894–95 (1971) (finding a distress sale where the taxpayer did not try to sell the property "until it only had 30 days in which to vacate its premises"); *Adams v. Commissioner*, T.C. Memo. 1995-142, 69 T.C.M. (CCH) 2297, 2299 (finding a distress sale where the taxpayer was unemployed, two years in arrears in property taxes, and behind on mortgage payments).

Petitioner has supplied no evidence that the real estate market in Shelby County was "distressed" at year-end 2016. To the contrary, petitioner asserts that the market for limestone aggregate was booming in part because real estate conditions were so favorable. And far from taking a loss, the Carpenters achieved a reasonable gain. They purchased the 105-acre parcel for $4,912 an acre in January 2014, and they sold the 110-acre parcel for $6,500 an acre in December 2016. They thus

realized a gain of $1,588 per acre, or roughly 32%, on an asset they had held for three years. That is not an earth-shattering profit, but it supplies no evidence that the sale was a "distress sale."

Four other facts confirm our conclusion that the Carpenters did not act under any "compulsion to sell." First, Mr. Carpenter testified firmly and credibly that the couple would not have sold the Sun Valley Tract if it meant taking a loss. His wife was adamant about that. A person who would refuse to sell if it entailed taking a loss can hardly be described as acting under a "compulsion to sell."

Second, Mr. Carpenter credibly testified (and his conduct showed) that he would have walked away from the transaction if raising cash from the Sun Valley Tract required that he participate as a partner in the SCE transaction. He consulted the lawyer to whom he owed the legal fees about this, and they agreed that participation as a partner was risky and ill advised. The Carpenters understood that their refusal to participate was disappointing to the promoters and that this could reduce the price Ranch Springs was willing to pay. A party who is willing to accept a lower price, rather than submit to unappealing conditions attached to a higher price, cannot be described as acting under a "compulsion to sell."

Third, the Carpenters negotiated with the Lewis brothers for 6 months regarding a possible sale. The Carpenters broke off discussions in September 2016, not wishing to be part of an SCE transaction. It was Mr. Rudakas (not they) who reopened negotiations in November. This temporal pattern hardly suggests that the Carpenters were desperate to unload the property. *See Redstone v. Commissioner*, T.C. Memo. 2015-237, 110 T.C.M. (CCH) 564, 573 (finding no distressed sale where leisurely pace of negotiations suggested a lack of compulsion to sell).

Finally, the $6,500 per-acre price the Carpenters achieved substantially *exceeded* the per-acre prices nearby residents achieved when selling land to entities controlled by the Lewis brothers. In December 2015 Locust Creek purchased a 177-acre tract in Vincent for $4,661 per acre. In December 2016 Bradford Resources purchased a 151-acre tract in Harpersville for $4,294 per acre. In December 2016 Tanyard Farms purchased a 138-acre tract in Harpersville for $4,049 per acre. And in December 2016 Sunnydale Springs purchased a 190-acre tract in Harpersville for $4,474 per acre. *See supra* pp. 13–14.

The four tracts listed above consisted of agricultural land lying within 3 miles of the Ranch Springs Property. The Lewis brothers purchased all four tracts for their supposed limestone mining potential. The average of the acquisition prices, $4,370, was 32% *lower* than the price the Carpenters achieved for their 110-acre parcel. And the median acquisition price of $4,253 per acre for large parcels of vacant land in Shelby County during 2014–20 was 35% *lower* than the price the Carpenters achieved for their 110-acre parcel. Far from suggesting that the Carpenters made a "distress sale," this evidence suggests that they were rather shrewd negotiators. *See Lightman v. Commissioner*, T.C. Memo. 1985-315, 50 T.C.M. (CCH) 266, 269–70 (finding no distressed sale where prices received were consistent with prices obtained for similar property during relevant period).

Petitioner next contends that the Carpenters lacked "reasonable knowledge of relevant facts" because they did not know the exact quality and quantity of the limestone underlying the Sun Valley Tract. AFI conducted exploratory drilling on the property for a week in December 2016. Although the Lewis brothers did not share the results of that drilling with the Carpenters, the Carpenters definitely knew that the property had (or was alleged to have) significant potential for limestone mining:

- Limestone outcroppings were plainly visible at multiple locations on the Sun Valley Tract. Mr. Carpenter assiduously maintained the property, and he frequently encountered chunks of limestone when using his agricultural equipment.

- During the second meeting to discuss a proposed sale, Bob Lewis, an experienced coal mining executive, brought out a geological map and showed Mr. Carpenter the seams of limestone that underlay the property at various depths.

- Bob Lewis and Mr. Rudakas assured the Carpenters that the property could profitably be developed as a limestone quarry. Mr. Carpenter credibly testified that Mr. Lewis emphasized "the value of the limestone" during their meeting. Mr. Lewis indicated that he intended to speak with (or had already spoken with) the mayor of Harpersville about opening a limestone quarry.

- Mr. Rudakas insisted that the Carpenters execute, and they did execute on December 7, 2016, a "drilling access agreement" authorizing exploratory drilling on portions of the Sun Valley Tract.

Mr. Rudakas made clear that the sale could not close until the drilling had been completed and its results analyzed. From this condition, the Carpenters could logically infer that Ranch Springs would not purchase the property unless the Lewis brothers regarded the drilling results as promising with respect to the proposed limestone quarry.

- The parties had extensive discussions regarding the exact number of acres that would be purchased. Mr. Carpenter understood that the acreage purchased needed to be sufficient to satisfy quarry requirements. Mr. Carpenter understood, in other words, that the Lewis brothers had gotten to the point of gauging the exact size of the proposed quarry. This fact, coupled with the fact that they had met with the mayor, suggested that they were serious about opening a limestone mine.

In assessing the Carpenters' "knowledge of relevant facts," we consider it important that the promoters, during the 6-month negotiation period, were not seeking *to hide* the limestone potential of the Sun Valley Tract. Quite the contrary: They repeatedly *emphasized* the Tract's limestone potential, hoping to persuade Mr. Carpenter to participate as a partner in the SCE transaction. This is not a case where a clueless seller is hoodwinked by a wily buyer into selling his land at a below-market price.

Treasury Regulation § 1.170A-1(c)(2) does not require that the buyer and seller have *perfect knowledge* of all *conceivable facts.* It requires only that they have "reasonable knowledge of relevant facts." The promoters represented to the Carpenters that the Sun Valley Tract could be developed into a profitable limestone quarry. That being so, petitioner is in a poor position to contend that the Carpenters, in agreeing to sell the land for $6,500 per acre, lacked "reasonable knowledge of relevant facts."

For these reasons, we conclude that the December 2016 sale was a transaction between "a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Ibid.* The Carpenters and Ranch Springs were unrelated parties dealing at arm's length. They negotiated for 6 months regarding the transaction. And the transaction occurred reasonably close in time to the valuation date (specifically, one year and six days before the easement was granted). We accordingly find that the price at which the 110 acres changed hands in December 2016—$6,500

per acre—provides very strong evidence as to the FMV of the Ranch Springs Property on the valuation date. *See Corning Place*, T.C. Memo. 2024-72, at *29–30 (concluding that recent sale of subject property was the "best evidence" of its value); *Excelsior Aggregates*, T.C. Memo. 2024-60, at *32 (same).

### 2. *Other Valuation Methods*

In the absence of actual transactions involving the subject property, courts typically consider one or more of three approaches to determine the property's FMV: (1) the market approach, (2) the income approach, and (3) an asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). In this case we consider these methods as providing a check on (or confirmation of) the $6,500 per-acre value indicated by the price Ranch Springs paid to acquire the 110-acre parcel. *Cf. Corning Place*, T.C. Memo. 2024-72, at *30–31.

In the case of vacant, unimproved property, the market approach—often called the "comparable sales" or "sales comparison" method—is "generally the most reliable method of valuation." *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)). The comparable sales method determines FMV by considering the sale prices realized for similar properties sold in arm's-length transactions near in time to the valuation date. *See ibid.*; *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). Because no two properties are ever identical, the appraiser must make adjustments to account for differences between the properties (e.g., parcel size and location) and terms of the respective transactions (e.g., proximity to valuation date and conditions of sale). *Wolfsen Land & Cattle Co.*, 72 T.C. at 19.

The income method determines FMV by discounting to present value the expected future cashflows from the property. *See, e.g., Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 327 (2013); *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision). Income-based methods are generally disfavored when valuing vacant land that has no income-producing history. *See, e.g., Chapman Glen Ltd.*, 140 T.C. at 327; *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 324–25 (2012), *supplementing* 131 T.C. 112 (2008), *aff'd in part, vacated in part and remanded*, 755

F.3d 236 (5th Cir. 2014). That is because the absence of a financial track record makes an income-based method inherently speculative and unreliable.

### 3.    *Highest and Best Use*

The choice of valuation method is influenced in part by the HBU of the subject property. We have defined HBU as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." *Whitehouse Hotel*, 139 T.C. at 331 (quoting Appraisal Institute, *The Appraisal of Real Estate* 277–78 (13th ed. 2008)). In short, to be a property's HBU, a proposed use must be (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. *See Buckelew Farm*, T.C. Memo. 2024-52, at *52.

Because property owners have an economic incentive to put their land to its most productive use, a property's HBU is presumed to be its current use absent proof to the contrary. *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962); *Mountanos v. Commissioner*, T.C. Memo. 2013-138, 105 T.C.M. (CCH) 1818, 1819, *supplemented by* T.C. Memo. 2014-38, *aff'd*, 651 F. App'x 592 (9th Cir. 2016). To establish an HBU different from the current use, a taxpayer must demonstrate both the "closeness in time" and the "reasonable probability" of the proposed use. *Hilborn*, 85 T.C. at 689. Proposed uses that "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable," are excluded from consideration. *Olson*, 292 U.S. at 257. In a case such as this, our inquiry entails "an objective assessment of how immediate or remote the likelihood is that the property, absent the [conservation] restriction, would in fact be developed, as well as any effect from zoning . . . laws that already restrict the property's potential highest and best use." Treas. Reg. § 1.170A-14(h)(3)(ii).

The HBU concept "is an element in the determination of fair market value." *Boltar*, 136 T.C. at 336. But it is simply one element. It does not supersede or eliminate the most important prerequisite in determining FMV, namely, that "a hypothetical willing buyer would

purchase the subject property for the indicated value." *Ibid.*; *see Corning Place*, T.C. Memo. 2024-72, at *41; Treas. Reg. § 1.170A-1(c)(2).[15]

          a.    *"Legally Permissible"*

The Ranch Springs Property is in a rural area, surrounded by agricultural and residential land. It was zoned A–1 Agricultural, a zoning classification that permitted only farming and low-density residential use (i.e., homes on one-acre lots). The property was used as pastureland when Ranch Springs purchased it. Agricultural and light residential use was thus the property's presumptive HBU in December 2017.

Respondent's expert Mr. Sheppard considered a variety of possible other uses, all of which would have required rezoning. These included higher density residential development, commercial or light industrial use, use as a landfill or large-scale solar array, and use as a limestone quarry. After considering market factors and obstacles to rezoning, Mr. Sheppard concluded that the HBU of the Ranch Springs Property was a continuation of its existing use, i.e., "agricultural, low-density residential, or passive uses as currently zoned." He used the term "passive uses" to refer to recreational uses (such as hiking, hunting, or fishing) that required no development.

Petitioner contends that the HBU of the Ranch Springs Property in December 2017 was as a limestone quarry. We reject that contention. Because the property was zoned A–1 Agricultural, a quarry was not a legally permissible use. Petitioner submitted no credible evidence to establish a "reasonable probability" that Harpersville would approve rezoning of the Ranch Springs Property to permit its use for mining.

Ranch Springs owned the tract for an entire year before granting the easement. But it did not submit a rezoning application or take any other step toward securing the zoning change, special exception, and ADEM permits that would be required to conduct mining on the land. We find that the Lewis brothers neglected to take these seemingly

---

[15] Petitioner errs in suggesting that the central question in this case concerns the "HBU value" of the property before the easement was granted. The central question concerns *the FMV* of the property at that time, i.e., the price that a willing buyer would pay a willing seller for the land, both acting without compulsion and having reasonable knowledge of relevant facts. *See* Treas. Reg. § 1.170A-1(c)(2). As stated in the text, HBU is one factor in determining FMV, but it does not supersede the most important factor, namely, that "a hypothetical willing buyer would purchase the subject property for the indicated value." *Boltar*, 136 T.C. at 336.

obvious steps because (1) they feared that a rezoning application would trigger strong neighborhood opposition and (2) they believed these steps would be a waste of money because they had no intention of ever operating a limestone mine on the Ranch Springs Property.

In urging that rezoning was reasonably probable, petitioner relies—as did Mr. Clark and AFI—on two pieces of evidence. The first is the April 2018 letter from the Bloom firm. But that letter did not offer a definitive opinion that rezoning to permit limestone mining was "reasonably probable." Rather, it concluded that rezoning might be approved "as long as there is not strong neighbor opposition to the mining request."

The Bloom letter explained that the rezoning process "is highly political and will turn on neighbor support/opposition." The firm spoke with Mayor Greene, who "emphasized the political nature of the [rezoning] decision (i.e., neighbor support/opposition is the driving factor)." Because the Ranch Springs Property "abut[ted] several properties zoned R–1 Residential," the Bloom letter advised that "it will be imperative to get these neighbors' support during the rezoning/special exception process."

Neither Ranch Springs nor its agents did any outreach to immediate neighbors or other Harpersville residents during 2016–2018 to gauge the level of community support for (or opposition to) a limestone quarry. The Bloom firm likewise conducted no investigation of this kind. It interviewed the Town Clerk and Mayor Greene, both of whom said that fair consideration would be given to any rezoning request. But they would provide no assurance about the fate of such a request, emphasizing that the outcome "would be heavily influenced by whether or not neighboring property owners oppose the request."[16]

The evidence at trial established that neighborhood opposition would likely have been intense. Ms. Pender and Mr. Glasscock were members of the Zoning Commission during 2016 and 2017, and both owned real estate near the Ranch Springs Property. Mr. Glasscock was the largest landowner in town—he owned roughly 11% of the total acreage within the Harpersville Town limits—and his property was less

---

[16] Petitioner asserts that neighborhood surveys are difficult to conduct because people often respond poorly to cold-calling and door knocking. But petitioner did not need to hire a consulting firm to do this. All it needed to do was file a rezoning application and see how neighbors reacted.

than half a mile from the Ranch Springs Property. One suspects that his views would have carried weight.

Ms. Pender and Mr. Glasscock credibly testified that they and most other neighbors would have opposed a limestone quarry because of concerns about (1) contamination of the water supply, most of which came from shallow wells; (2) deleterious runoff into the Coosa River two miles south of the Town; (3) noise and dust from a quarry operation; (4) traffic congestion on local roads from trucks hauling aggregate; and (5) damage to the comfortable rural environment residents prized. They credibly testified that, as members of the Zoning Commission, they would have voted against a proposal to rezone the Ranch Springs Property for use as a quarry. They believed that this position "would have been the consensus of most of the community." Mayor Greene, who served as Mayor during 2016–2020, echoed that view, explaining that a quarry on the Ranch Springs Property "probably would not be looked on favorably" by nearby property owners.

Petitioner presented no testimony at trial from any current or former member of the Zoning Commission or Board of Adjustment. Petitioner offered no analysis that attempted to gauge the level of neighborhood opposition to (or support for) a limestone quarry. Petitioner's sole evidence on this point consisted of testimony from one former neighbor, Daniel Gardner. We discounted his testimony because he was an investor in an SCE transaction. He thus had a personal interest in testifying that the Ranch Springs Property, which was next to his, could have been rezoned to permit limestone mining. *See supra* p. 19.

The second piece of evidence on which petitioner relies is the September 6, 2016, letter signed by Theo Perkins, who was Mayor of Harpersville on that date. This letter was drafted by Bob Lewis and typed up by Mr. Rudakas, who attempted to mimic the letterhead on the Town's official stationery. The letter was presented to Mayor Perkins during a meeting, and he signed it at Mr. Lewis's request.

We find this this letter has no probative value in determining whether rezoning of the Ranch Springs Property was "reasonably probable" in December 2017, when the easement was granted. That is so for at least three reasons:

- Mayor Perkins's term expired in November 2016. He would thus have held no official position if and when a rezoning application were submitted.

- Rezoning applications must be approved by the Zoning Commission. The Mayor of Harpersville has no vote on that Commission and no unilateral authority regarding zoning matters. Although Bob Lewis drafted the letter to say that "the City would certainly approve a rezoning . . . to allow mining," Mayor Perkins credibly testified that he meant only that the Town would give fair consideration to such a request.

- Petitioner supplied no credible evidence that Mayor Perkins's letter addressed possible rezoning of the Ranch Springs Property. The mayor could not recall a meeting that involved discussion of the Ranch Springs Property, to which he referred as the "Carpenter property." Rather, he credibly testified that the meeting he attended and the letter he signed both addressed a possible rezoning of the Tanyard Farms property, in which the Lewis brothers were also interested. *See supra* pp. 16–17. Petitioner could not produce the original of the September 6, 2016, letter with an attached Exhibit A, which would have identified the property to which the author was referring.

At trial Mayor Perkins credibly testified that he met with Bob Lewis only once and that, to the best of his recollection, the property map attached as Exhibit A to the letter he signed was a map of the Tanyard Farms property. Mr. Rudakas subsequently testified that there were multiple meetings with Mayor Perkins and suggested that the Ranch Springs Property may have been discussed at another of those meetings. But Mr. Rudakas admitted that he himself did not attend any meeting with Mayor Perkins. Mr. Rudakas has a personal financial interest in the outcome of this case, and we found his testimony to lack credibility in several respects. We credited Mayor Perkins's testimony over his.[17]

For these reasons, we conclude that petitioner has failed to carry its burden of proving that rezoning the Ranch Springs Property to

---

[17] Given our finding that Mayor Perkins's letter addressed possible rezoning of the Tanyard Farms property, the letter seems even less helpful to petitioner. The Tanyard Farms property was three miles from the Ranch Springs Property. Assuming arguendo that neighbors could have been persuaded to support a quarry on the Tanyard Farms property, it seems unlikely—for economic feasibility and other reasons— that they would have rallied behind a second quarry so near the first. *See Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at *49 (noting that approval of rezoning of other properties for the same use might impede or prevent such approval for the subject property).

permit operation of a limestone quarry was "reasonably probable." Because mining was not a legally permissible use in December 2017, and because petitioner has not convinced us that rezoning was reasonably probable, we hold that limestone mining was not the property's HBU.

b.  *"Financially Feasible"*

Even if Ranch Springs could have secured rezoning approval, we find that use of the property as a limestone quarry was not financially feasible. As we explain more fully below, the income and expense projections made by AFI and Mr. Wick were wildly optimistic. *See infra* pp. 58–62. Their most significant error, however, was their unsupported assumption that the local market could absorb additional supply of aggregates in the range of 500,000 to 700,000 tons annually. Assuming arguendo that this volume of salable limestone existed on the property, petitioner has failed to establish "the existence of a market 'that would justify its extraction in the reasonably foreseeable future.'" *Esgar Corp. v. Commissioner*, T.C. Memo. 2012-35, 103 T.C.M. (CCH) 1185, 1190 (quoting *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)), *aff'd*, 744 F.3d 648 (10th Cir. 2014).

In making this assumption, petitioner's experts relied chiefly on projected rates of economic and population growth in the local area. But they failed to show that the needs of an expanding population could not be met by the quarries already in operation, which had plenty of unused production capacity. As Dr. Rigby correctly observed, existing players can capture new demand much faster and more easily than a greenfield site—i.e., raw land that had never been mined—that would take years to get up and running.

In 2017 there were seven well-established limestone quarries in Shelby County and nine more in the adjoining counties. The biggest quarries in Shelby County were operated by Vulcan and Martin Marietta, the top two producers of construction aggregates in the United States. A knowledgeable trucking company official credibly testified that Vulcan and Martin Marietta had a "chokehold" on the local aggregate market.

The Shelby County quarries produced more than 10 million tons of limestone during 2017, and the nearby quarries produced another 5 million tons. Vulcan's Calera quarry, which produced 3 million tons of limestone in 2017, typically sells only 85% of the limestone it can produce. Vulcan's Childersburg quarry, which was 12 miles from the Ranch

Springs Property, was one of Vulcan's three worst-performing quarries in the United States. Nationwide, Vulcan reported that it was operating at 55% to 60% of capacity in 2015 and "well below full capacity" in 2016. These data suggest to us that Vulcan could have satisfied—virtually by itself—the relatively modest needs of the area's growing population. Petitioner's experts did not convince us otherwise. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at \*35–37 (finding that gravel mining was not a property's HBU where there was already an adequate supply in the market and existing suppliers could meet any new demand); *Esgar*, 103 T.C.M. (CCH) at 1197 (same).

The saga of White Rock confirms our view that there was little demand for additional aggregate supply in Shelby County. In October 2009 White Rock applied to rezone property in Vincent, the town adjoining Harpersville, for use as a limestone mine. White Rock eventually completed the ADEM permitting process in 2019. But as of 2024 no quarry had commenced operations.

Seeking to understand why, Mr. Sheppard interviewed two local land brokers, Vulcan's plant manager at Childersburg, and a zoning official in Vincent. As Mr. Sheppard reported, they "were all under the impression that the White Rock operators decided not to pursue mining the 1,000+/− acre property." This outcome is difficult to reconcile with petitioner's experts' projections that a quarry on the Ranch Springs Property could capture 6% or more of the local market.

Finally, the Lewis brothers' own actions—more particularly, their inaction—shows that limestone mining was not the HBU of the Ranch Springs Property. Both men had spent their entire careers in mining. They allegedly desired to diversify their business away from coal and into limestone, which they thought held greater profit potential. They allegedly had plenty of mining equipment and startup capital at their disposal. But they declined to open a limestone quarry on the Ranch Springs Property, on the Meadows golf course across the road, or on any of the 10 nearby properties they acquired, all of which were situated over the same limestone formation. We regard this as strong evidence that the Lewis brothers themselves did not regard limestone mining on these properties as "financially feasible." *See Corning Place*, T.C. Memo. 2024-72, at \*38–39 (finding that addition of a 34-story tower atop a historic building was not the property's HBU where experienced real estate developers chose to pursue a conservation easement instead); *Oconee Landing*, T.C. Memo. 2024-25, at \*40 (finding that immediate

residential development was not property's HBU where experienced real estate developers chose to pursue a conservation easement instead).

After considering these market factors and obstacles to rezoning, Mr. Sheppard (respondent's expert) concluded that the HBU of the Ranch Springs Property was a continuation of its existing use as currently zoned. Petitioner has submitted no evidence to controvert that conclusion, apart from embracing limestone mining as the property's HBU. We accordingly accept Mr. Sheppard's opinion that the HBU of the Ranch Springs Property in December 2017 was agricultural, low-density residential, and recreational use.

4. *Comparable Sales Approach*

The comparable sales approach "values property by comparing it to similar properties sold in arm's-length transactions around the valuation date." *Savannah Shoals*, T.C. Memo. 2024-35, at *36. This method is usually the most reliable indicator of value when sufficient information exists about sales of properties resembling the subject property. *See United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979) ("Courts have consistently recognized that, in general, comparable sales constitute the best evidence of market value."); *Whitehouse Hotel*, 139 T.C. at 324–25 (stating that other valuation methodologies are "not favored if comparable-sales data are available").

The comparable sales method is based on the "principle of substitution." It stands for the proposition that "the value of a property can be estimated at the cost of acquiring an equally desirable substitute." *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at *51; *see Buckelew Farm*, T.C. Memo. 2024-52, at *50 n.25, *55 ("[T]he principle of substitution . . . stands for the proposition that a hypothetical buyer will not pay more for a given property when an alternative property is available for less."); *Estate of Rabe*, 34 T.C.M. (CCH) at 119 ("[A] prudent man will pay no more for a given property than he would for a similar property.").

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation . . . .'" *Oconee Landing*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24). That is because "the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers." *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe*, 34 T.C.M. at 119). This general rule applies with no less force when the unimproved property sought to be valued has potential for mineral

extraction.  *See J L Minerals*, T.C. Memo. 2024-93, at \*58; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*38; *Savannah Shoals*, T.C. Memo. 2024-35, at \*35.

Mr. Sheppard correctly characterized the Ranch Springs Property as "exploratory stage mineral property."  This characterization was supported by Dr. Rigby and Dr. Stryhas, respondent's geological experts.  They agreed that, given the modest exploratory work AFI had done—analyzing data from drilling nine boreholes and one corehole to a depth of 225 feet—the limestone beneath the Ranch Springs Property could be classified only as an "inferred mineral resource."

Petitioner's trial expert, Mr. Wick, agreed that AFI's exploratory drilling did not establish any mineral "reserves," as AFI had concluded, but only an "indicated resource."  An "inferred mineral resource" inspires a relatively low level of geological confidence because the quantity and quality of the minerals is estimated on the basis of limited geological evidence and sampling.  *See J L Minerals*, T.C. Memo. 2024-93, at \*48 (finding a geological report that supported only a conclusion of an inferred resource "too preliminary" to establish the existence of commercially exploitable amounts of kaolin clay).

Given these characteristics of the Ranch Springs Property, Mr. Sheppard properly searched for transactions involving similarly sized agricultural parcels, where the parties knew that minerals were present, but where no entitlements (such as required zoning and permits) had yet been obtained that would allow minerals to be mined.  Under the "principle of substitution," such sales should reflect what willing buyers pay willing sellers for land that has potential for mineral development, but which would require significant capital investment to determine the feasibility of that potential.

Mr. Sheppard selected sales of three comparable properties.  The first was the Carpenters' sale of the 110-acre tract to Ranch Springs for $6,500 per acre in December 2016.  As explained previously, that was an arm's-length sale in which both parties were aware that the land had potential for limestone mining.  *See supra* pp. 34–40.  Indeed, Mr. Lewis repeatedly emphasized the property's limestone potential in the hope of convincing the Carpenters to participate as partners in the SCE venture.  We have previously concluded that this transaction provides strong evidence as to the FMV of the Ranch Springs Property.  *See supra* pp. 39–40.

Mr. Sheppard's second comparable sale was the sale of a 74-acre parcel in Calera for $6,466 per acre in December 2016. The largest limestone quarries in Shelby County—operated by Vulcan, Martin Marietta, and Lhoist—were not far from Calera. *See supra* pp. 21, 30. Mr. Sheppard confirmed that there was limestone on this property, that it was in a "heavily active" quarrying market, and that exploratory drilling had been conducted on the property before the sale.

Mr. Sheppard's third comparable sale was the sale of a 197-acre parcel in Chelsea, Shelby County, for $6,738 per acre in June 2016. This property, like the other two, was located on a major highway and had visible limestone outcroppings. Rather than using the property for mining, the buyer decided to develop it into a residential subdivision.

After making appropriate adjustments to these sale prices, Mr. Sheppard determined that the "before value" of the Ranch Springs Property was $6,550 per acre. This valuation conclusion is consistent with other evidence in the record. Ms. Pender, a longtime realtor in Harpersville, credibly testified that agriculturally zoned land comparable in size to the Ranch Springs Property typically sold during 2017 for $3,500 to $4,500 per acre.

The Shelby County Tax Office maintains comprehensive records of land sales for tax assessment purposes. According to its records, 64 large parcels of vacant land (i.e., parcels consisting of 45+ acres) were sold in arm's-length transactions between October 2014 and September 2020. The median sale price for these parcels was $4,253 per acre. The average sale price was $6,935 per acre.

In December 2015 Locust Creek, which was controlled by the Lewis brothers, purchased a 177-acre tract roughly 3 miles from the Ranch Springs Property. They commissioned exploratory drilling on the property (apparently supervised by AFI) during 2016. They evidently viewed the drilling results as demonstrating significant potential for limestone mining; indeed, Locust Creek took the position that the property would be worth almost $25 million if developed as a limestone quarry. Given these facts, petitioner cannot seriously dispute that the Locust Creek property was comparable to the Ranch Springs Property. But the price at which the Locust Creek property changed hands, in a December 2015 arm's-length sale, was $825,000, or $4,661 per acre.

In December 2016 entities controlled by the Lewis brothers purchased three other tracts in Harpersville—Bradford Resources, Tanyard

Farms, and Sunnydale Springs—that were similar in size to the Ranch Springs Property and within 3 miles of it. The Lewis brothers allegedly believed that all three properties had limestone mining as their HBU. They acquired these properties in arm's-length transactions for $4,294 per acre, $4,049 per acre, and $4,474 per acre, respectively. *See supra* pp. 13–14.

Mr. Clark acknowledged in his appraisal that the Harpersville real estate market "was active" during 2015 and 2016. But he asserted that "sales comparables were not present in sufficient quantity or similarity to use as a basis for the market approach." He allegedly "made a search for mining parcels similar to the Subject Property," but he was supposedly unable "to find any in the normal course of business."

The market data discussed above show that Mr. Clark did not look very hard, or that he was looking for the wrong thing. The statement in his appraisal that he searched for "mining parcels" suggests that he restricted his inquiry to sales of operating mines or properties that had been zoned and permitted for mining. At trial he confirmed that he did not use the sales comparison approach "because there were no sales of active mining mineral properties with known quantities of minerals." The absence of such transactions would not be surprising: Mr. Glasscock credibly testified that no one had ever submitted an application to rezone land in Harpersville for use as a quarry.

But the Ranch Springs Property was not an operating mine, and it had not been zoned or permitted for mining. Rather, it was raw land that contained only an inferred mineral resource that (as Dr. Rigby credibly testified) "d[id] not have the completed technical work to demonstrate that the [mining] project will be viable." The Ranch Springs Property, in short, was not comparable to what Mr. Clark termed a "mining parcel." What the Ranch Springs Property was comparable to—as Mr. Sheppard correctly determined—were other exploratory stage mineral properties. Mr. Sheppard's report, coupled with the other transactions in which the Lewis brothers engaged, shows that the going rate for exploratory stage mineral properties in the Harpersville area was in the range of $4,500 to $6,500 per acre.

Petitioner asserts that "it is practically impossible to apply the comparable sales method when valuing property that's proposed for mineral extraction," even where that property is raw land. If exploratory drilling has been done on the subject property, petitioner insists that no other property—no matter how ostensibly comparable—can be

treated as "comparable" unless it too has been drilled and its mineral content definitively established.

Petitioner cites no appraisal texts or appraisal literature to support its theory, and we have discovered none. Mr. Sheppard, by contrast, cited a recognized appraisal text for the proposition that, "[i]f the deposit to be appraised is undeveloped and non-producing, that is, is raw land, the sales comparison method is preferable." Robert H. Paschall, *Appraisal of Construction Rocks* 3 (2d ed. 1999). And Mr. Clark acknowledged in his appraisal that "the Coal Evaluation Handbook, developed by the U.S. Department of the Interior Bureau of Land Management, concludes [that] the best approach for determining the Fair Market Value of the property is by using the sales comparison approach."

Petitioner likewise offers no judicial authority to support its novel theory. Our Court has held for years that the comparable sales approach is usually the best method for valuing undeveloped property— here, raw land. *See supra* p. 40. And we have carved out no exception for raw land that contains minerals. *See, e.g.*, *Green Valley Invs., LLC v. Commissioner*, T.C. Memo. 2025-15, at *32–33 (using comparable sales method to determine value of land containing limestone); *J L Minerals*, T.C. Memo. 2024-93, at *56 (using comparable sales method to determine value of land containing kaolin clay); *Excelsior Aggregates*, T.C. Memo. 2024-60, at *38 (using comparable sales method to determine value of land containing sand and gravel); *Savannah Shoals*, T.C. Memo. 2024-35, at *35–36 (using comparable sales method to determine value of land containing granite). The appellate courts have done the same. *See, e.g.*, *United States v. 421.89 Acres of Land*, 465 F.2d 336, 338 (8th Cir. 1972); *United States v. Whitehurst*, 337 F.2d 765, 775 (4th Cir. 1964) (finding valuation that ignored comparable property sales evidence in valuing alleged mineral property to be "grossly mistaken"); *cf. Palmer Ranch Holdings Ltd v. Commissioner*, 812 F.3d 982, 1003–04 (11th Cir. 2016) (finding unexplained deviation from the comparable sales method improper), *aff'g in part, rev'g in part, and remanding* T.C. Memo. 2014-79.

There was nothing special or unique about the limestone underneath the Ranch Springs Property. The same limestone formation underlies virtually all of Shelby County. Given the modest exploratory drilling AFI had done, the underlying limestone could not be classified as a "mineral reserve" but only as an "inferred mineral resource." And Ranch Springs had taken no steps toward securing rezoning approval, required permits, or other entitlements for the property. In short, the

Ranch Springs Property constituted raw land with possible potential for mineral development.[18]

As noted above, we have previously endorsed the comparable sales method as an appropriate technique for determining the FMV of exploratory stage mineral properties. And we have never held that knowing the precise quantity and quality of minerals on another property is necessary to consider sale of the latter to be potentially comparable. *Accord, e.g.*, *United States v. Am. Pumice Co.*, 404 F.2d 336, 336 (9th Cir. 1968) (rejecting claim that mineral properties are rarely comparable due to differences in quantity and quality of minerals); *see J L Minerals*, T.C. Memo. 2024-93, at *56 (rejecting contention that preliminary geology report rendered property too unique to permit its valuation under the comparable sales method).

The comparable sales method is perfectly capable of capturing transactions involving exploratory stage mineral properties. If the market for aggregates was as robust and profitable as petitioner contends, one would expect that mining companies and investors would be on the lookout to acquire property in the area. This would cause land prices to drift up to reflect this demand. But land prices in Harpersville were quite stable between 2014 and 2020: The median per-acre sale price for large parcels was $4,253 and the average was $6,935.

Finally, petitioner asserts that Ranch Springs would not have been a "willing seller" at the prices indicated by Mr. Sheppard's comparable sales analysis. Instead of selling the land, petitioner says, "a realistic alternative use to Ranch Springs would have been to operate it as a limestone quarry." And that would supposedly have made the land worth $26 million.

This argument is a nonstarter for several reasons. First, the argument assumes its own conclusion, i.e., that operation of a quarry

---

[18] Petitioner cannot plausibly dispute that the Ranch Springs Property, which was wholly undeveloped and had been used for grazing for 20+ years, constituted "raw land." But petitioner in its Posttrial Briefs repeatedly equates "raw land" with the *surface interest*, urging that the key question is not the value of the "raw land," but the value of the right to exploit the minerals beneath it. Petitioner urges a false dichotomy. As of the valuation date, there had been no severance of the surface interest from the subsurface interest. At year-end 2017, therefore, the FMV of the raw land equaled the value of the right to exploit the surface interest *plus* the value of the right to exploit the subsurface minerals. The question is what a willing buyer would have paid for the land in December 2017, cognizant that ownership of the land would grant him this entire bundle of rights.

would have been legally permissible and financially feasible, neither of which it was. *See supra* pp. 42–48. Second, Ranch Springs, which was organized to generate tax deductions for investors, had neither the ability nor the intention to operate a quarry. When attempting (unsuccessfully) to convince Mayor Greene to sign a letter voicing support for a quarry, Tom Lewis confirmed that he had no intention of opening a quarry. Indeed, he emphasized that there would "never, never, never" be a quarry on the Ranch Springs Property. Finally, the "willing buyer/willing seller" test seeks to determine the price on which a *hypothetical* buyer and a *hypothetical* seller would agree. Treas. Reg. § 1.170A-1(c)(2). The mindset of the specific property owner on the valuation date is irrelevant to this inquiry.

We conclude that the comparable sales approach provides the most reliable method for determining the "before value" of the Ranch Springs Property. Mr. Sheppard chose sales of reasonably comparable properties. After making appropriate adjustments for his second and third comparables, he determined a "before value" of $6,550 per acre. Petitioner does not seriously quibble with any of Mr. Sheppard's specific adjustments (apart from asserting that no property can be "comparable" unless its exact mineral content has been established). And petitioner's experts offered no competing comparable sales of their own to support the value petitioner claims.

The "before value" determined by Mr. Sheppard corresponds almost exactly to the price—$6,500 per acre—that Ranch Springs paid to acquire the 110-acre tract in December 2016. We accordingly conclude that the value of the Ranch Springs Property before the granting of the easement was $720,500, as determined by Mr. Sheppard.

5. *Income Approach*

Dismissing the sales comparison approach, Messrs. Clark and Wick employed the income approach—often called the "income capitalization" method—to determine the "before value" of the Ranch Springs Property. The income method determines FMV by discounting to present value the expected future cashflows from the property. *See, e.g., Chapman Glen Ltd.*, 140 T.C. at 327; *Marine*, 92 T.C. at 983. The theory behind this approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income. *See Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 100 T.C.M. (CCH) 581, 583, *aff'd*, 493 F. App'x 944 (10th Cir. 2012).

Messrs. Clark and Wick both posited that the HBU of the Ranch Springs Property was development as limestone quarry. Premising his appraisal on the AFI study, Mr. Clark constructed a DCF spreadsheet to estimate the NPV of operating a limestone mining business on the property for 35 years. Equating the assumed value of the hypothetical mining business to the value of the land, he asserted that the "before value" of the land—that is, its value before the granting of the easement—was $26,034,064, or $236,673 per acre. Mr. Wick adopted essentially the same methodology but employed different assumptions (e.g., a mine with a 28-year life). He concluded that the FMV of "the Ranch Springs [P]roperty mineral and associated mining rights" was $18 million before the granting of the easement.

We reject for numerous reasons the valuation methodology deployed by petitioner's experts. First, both premised their DCF analyses on the assumption that conversion to a limestone quarry was the HBU of the Ranch Springs Property. We have rejected that assumption, ruling that petitioner failed to establish that mining was a legally permissible use (or was reasonably likely to become a legally permissible use in the near future). The DCF analyses deployed by Messrs. Clark and Wick thus fall of their own weight.

Second, even if mining were thought to be the property's HBU, we would reject the income capitalization method as deployed by Messrs. Clark and Wick. The income method is most reliable when used to determine the value of an existing business, with a track record of growth, income, expenses, and profits. A historical track record of this sort provides a plausible basis for projecting future revenue. The income approach is rarely appropriate when seeking to determine the value of raw land or other undeveloped property with no existing cashflow. *See, e.g.*, *Chapman Glen Ltd.*, 140 T.C. at 327; *Whitehouse Hotel*, 139 T.C. at 324–25 (noting that the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings" (quoting *Whitehouse Hotel*, 131 T.C. at 153)).

When the income approach is used, the Court must examine the plausibility of the critical assumptions made by the appraiser. *See Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, 97 T.C.M. (CCH) 1818, 1820. Each assumption, whether large or small, carries with it "some risk of error." *Whitehouse Hotel*, 139 T.C. at 323. As interdependent assumptions multiply, the risk of error can increase exponentially: "[R]elatively minor changes in only a few of [an expert's] assumptions [can] have large bottom-line effects." *Ibid.*

We have often noted "the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings." *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 89 (1973), *aff'd*, 500 F.2d 1400 (3d Cir. 1974) (unpublished table decision). Lacking reliable data, the appraiser inevitably must rely on a lengthy series of assumptions, estimates, and guesstimates.

The U.S. Court of Appeals for the Fifth Circuit noted this problem in a mining case decided 70 years ago. *See Ga. Kaolin Co. v. United States*, 214 F.2d 284 (5th Cir. 1954).[19] The question in that eminent domain case was the FMV of land whose HBU was kaolin mining. The Fifth Circuit affirmed the district court's rejection of the landowner's proposed valuation method, viz., "estimating the amount of stone in situ and multiplying this amount by a fixed price per unit." *Id.* at 286. The court explained that the landowner's proposed methodology involved numerous assumptions: "[W]hether or not the deposits would be mined and [what] royalties [would be] paid would depend upon the condition of the market, the uncertainty of the future, the demand for the product, 'and many other elements, on and on, in the future.'" *Ibid.* In short, the Fifth Circuit upheld rejection of the income approach "largely based on its speculativeness." *Ibid.*

The speculativeness problem is obvious here, requiring the appraiser to estimate the cost of creating a limestone business from scratch and to predict its future income, capital expenditures, and dozens of distinct cost items over a period of up to 35 years. Performed under these constraints, the DCF method becomes highly speculative, making it inferior to the sales comparison method, which draws its conclusions from the market. *See Ambassador Apartments*, 50 T.C. at 243–44 (rejecting real estate valuation premised on the income approach in favor of market value established by recent sales); *J L Minerals*, T.C. Memo. 2024-93, at *56 (finding that the income approach would be inappropriate even if mining were the property's HBU); *Excelsior Aggregates*, T.C. Memo. 2024-60, at *40 (same).

Third, if an income method were thought to be appropriate to determine the "before value" of the Ranch Springs Property, we would reject the owner-operator version of this method as deployed by petitioner's experts. They both equated the value of the land with the going

---

[19] Decisions from the Fifth Circuit issued before October 1, 1981, are binding precedent in the U.S. Court of Appeals for Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

concern value of a limestone mining business conducted on the land. That equation defies economic logic and common sense. *See Van Zelst v. Commissioner*, 100 F.3d 1259, 1263 (7th Cir. 1996) (reasoning that where "*land* is not a scarce resource . . . financing and entrepreneurship are the scarce ingredients, so they will capture the economic return"), *aff'g* T.C. Memo. 1995-396.

The DCF technique is routinely used by businesses to estimate the value of an investment opportunity—e.g., the acquisition of another company or the construction of a new factory. The DCF method seeks to determine the NPV of future cashflows from the proposed investment. If management views the NPV as offering an acceptable rate of return, the company will pursue the investment.

By estimating the NPV of a hypothetical mining business, petitioner's experts sought to determine the *total value* of the proposed investment as a going concern. But here we are seeking to determine the value of raw land. The raw land is just one of the costs that would need to be incurred in constructing the hypothetical mining business. Why would a rational investor pay the entire NPV of the mine's future operations in order to defray one component cost?[20]

Petitioner repeatedly cites testimony from fact witnesses indicating that mining companies regularly use DCF techniques when deciding whether to pursue a proposed mineral investment. That testimony seemed perfectly plausible to us. But the fact that a mining company uses a DCF in deciding whether to open a mine does not mean it would pay the entire NPV of the mine merely to acquire the land. The cost of acquiring access to the minerals would simply be one of the many costs

---

[20] The same point can be illustrated by an example that does not involve mining. Suppose a landowner puts a conservation easement on a ten-acre exurban lot that is zoned agricultural/single-family residential. An appraiser is hired to determine the "before value" of the lot. A potential buyer of this lot could do various things with it. He could farm it, build a modest bungalow, build a two-story house, or build a $25 million mansion. It seems obvious that a sane appraiser would determine the FMV of the lot by searching for recent sale prices for similar residential lots. He would not conclude that the land is worth $25 million because it could be developed into a mansion that could be sold for $25 million. Even if the appraiser believed that use as a mansion was the lot's HBU—a dubious proposition—he would not equate the value of the land to the value of the fully constructed mansion. A knowledgeable willing buyer intent on building a mansion would not pay $25 million for the land, because he would still have to pay for construction of the house.

that are input into the spreadsheet to calculate the NPV of the proposed mining investment.

At trial we heard testimony from fact witnesses (many of whom worked for Vulcan) with decades of experience in the coal and aggregates business in Alabama. They consistently testified that a mining company seeking to acquire a greenfield site will typically choose to acquire access to the minerals by lease, not by purchase. That is because the company usually will not want to hold all that land (and accompanying debt) on its balance sheet. *See supra* note 10.

These witnesses explained that royalty rates for leasing mineral property in Alabama, while more variable than in the oil and gas industry (typically 3/16), usually ranged between 8% and 12% of the value of the production f.o.b. mine. One witness estimated that this lease cost— i.e., the cost of acquiring access to the minerals by paying a royalty— would be roughly 5% of the total costs of constructing the new mining business. These witnesses were called by petitioner, and petitioner did not challenge their testimony.

Their testimony confirms what logic tells us. Why would a mining operator seeking to acquire a greenfield site for a quarry pay the entire NPV of the prospective mining operation in order to purchase the land, when it could acquire access to the mineral interest by lease for small fraction of that sum? When asked this question, Mr. Wick replied that "this would depend on the landowner's willingness to lease the land." But the testimony of experienced mining professionals was that leasing is how mining operators *typically acquire* mineral property in Alabama. Petitioner supplied no evidence that sellers' reluctance to lease is a real-world problem. In any event, any reluctance could presumably be overcome by negotiating a royalty rate acceptable to the lessor.[21]

---

[21] Mr. Wick made the point that a business seeking to expand into a new market may be willing to pay a substantial premium to acquire a company in that market rather than attempting to build from scratch. This is sometimes called a "bridgehead" situation, where the business seeks a base from which to launch operations into the new market. That rationale has no application here. First, Ranch Springs had no existing business; it purchased the Ranch Springs Property for the purpose of generating tax deductions for investors. Second, the "bridgehead" rationale applies with greatest force when an established business is seeking to expand into a new market *by acquiring an existing business*. An existing business has a customer base, a knowledgeable workforce, and goodwill. Land by contrast is relatively fungible, with similar property available at multiple locations. A business seeking to expand into a new

Mr. Clark acknowledged in his appraisal that, in the case of mineral properties, a well-recognized income approach is "the capitalized royalty income method," which values the mineral deposit "as if the subject's landowner were leasing to an operator." The royalty income method, he explained, values the property by "discount[ing] the stream of projected royalty income to a present value." To implement this methodology, "[a]n appropriate royalty rate and associated discount rate must be extracted from the market and used to capitalize the royalty income."

Mr. Clark admits in his appraisal that "[c]alculating the present value of the projected income using the Royalty Income [approach] would result in a substantially lower fair market value for a given property, perhaps 1/10th or less of the value obtained" from the owner-operator approach. This admission is consistent with the trial testimony of the Vulcan witnesses discussed above. And we think it is fatal to the methodology Messrs. Clark and Wick deployed. No rational mine operator would pay the entire NPV of the prospective mining business to purchase the land if he could acquire access to the minerals by lease for 10% or less of that sum.[22]

Mr. Clark asserted that the owner-operator method was nevertheless appropriate here "due to the owner [i.e., the Lewis brothers] living within close vicinity to the property, as well as having the ability to operate the mine, rather than having to hire someone to do so." This rationale is wholly unconvincing. For starters, a one-sentence explanation is not enough to justify Income Approach A that generates a result ten times higher than Income Approach B, each being recognized as valid. Especially is that so given that mine operators looking to acquire

market would have little incentive to pay a huge premium for raw land. In any event, the premium it decides to pay for raw land would rarely if ever equal the entire NPV of the projected business opportunity.

[22] Petitioner argues that the royalty income method is irrelevant here because respondent did not amend his Answer to assert this theory. This argument misses the point. Neither party contends that the royalty income method should be used to determine the "before value" of the Ranch Springs Property. But the existence of the royalty income method, as a recognized alternative to the owner-operator method, is logically relevant in deciding whether Mr. Clark's embrace of the latter was reasonable. Petitioner's assertion that respondent improperly injected the royalty income method into the case at the eleventh hour is simply wrong. It was *Mr. Clark* who first raised this issue in the appraisal attached to Ranch Springs's 2017 return. Mr. Sheppard devotes numerous pages in his expert report to discussion of this issue; indeed, the term "royalty" appears no fewer than 50 times in his report. And numerous fact witnesses presented testimony about mineral royalties and royalty rates.

a greenfield site in Alabama typically do so by leasing rather than by buying.

In any event the Ranch Springs Property was owned by a partnership whose members were high-net-worth individuals seeking tax deductions. They owned 94% of Ranch Springs, and they explicitly rejected the "mine development option" in favor of the "conservation easement option." The Lewis brothers owned only 3.75% of Ranch Springs, and there is no evidence that those two men had "the ability to operate the mine." They had multiple opportunities to venture into limestone mining but rejected each opportunity, allegedly because "the timing was not right." And assuming arguendo that the Lewis brothers had the ability to operate a limestone mine, they would not rationally pay the entire NPV of the prospective mining business merely to acquire the land.[23]

Finally, even if the owner-operator version of the income method were thought appropriate to determine the "before value" of the Ranch Springs Property, we find numerous shortcomings in petitioner's experts' implementation of that approach:

- AFI in its report simply stated its estimated costs for the quarry, without explaining what data it considered in arriving at those numbers or what assumptions it made. Mr. Wick derived his data from the costs of operating a granite quarry, but he failed to explain how or why he adjusted those items to reflect the costs of operating a limestone quarry.

- Petitioner's experts often make wildly divergent cost estimates. As just one example, AFI estimated drilling and blasting costs at $0.385 per ton, whereas Mr. Wick estimated these costs at $0.90 per ton. Assuming production of 700,000 tons annually, this difference alone could generate an annual production cost increase of $360,500, or roughly $11 million over the quarry's assumed life.

---

[23] The central error committed by Messrs. Clark and Wick was equating the value of the land (one cost input to the DCF) with the total NPV of the hypothetical mining business (the bottom-line output of the DCF). Theoretically, an NPV-oriented method might be employed in an effort to estimate the value of the land, but only if all other value inputs were stripped out so as to *isolate* the value of the land. But it would seem illogical to conjure an imaginary business with myriad hypothetical inputs and outputs just to back into a purported value for the land. An objective appraiser would not turn to an NPV-oriented method given its inherent uncertainties, especially where comparable land sales are plentiful.

This example underscores the problem inherent in using a DCF model to estimate the FMV of raw land: "[R]elatively minor changes in only a few of [an expert's] assumptions [can] have large bottom-line effects." *Whitehouse Hotel*, 139 T.C. at 323.

- In determining the market share that a quarry on the Ranch Springs Property could command, neither AFI nor Mr. Wick considered the existing supply provided by the 16 quarries already operating in Shelby County and adjacent counties, including those operated by Vulcan and Martin Marietta, which held a "chokehold" on the local market. *See Excelsior Aggregates*, T.C. Memo. 2024-60, at *45 (rejecting DCF analysis that failed to account for existing supply in market); *Savannah Shoals*, T.C. Memo. 2024-35, at *38 (same). AFI and Mr. Wick likewise failed to consider the supply that would be provided by the 10+ other limestone quarries that the Lewis brothers and Mr. Rudakas were proposing to investors.

- AFI assumed that a hypothetical quarry on the Ranch Springs Property would serve a market within a 40–50 mile radius. AFI correctly noted that this radius would include Shelby County and portions of Jefferson, St. Clair, Talladega, Clay, Coosa, Chilton, and Bibb Counties. But AFI used *the entire population* of all 8 counties to estimate the projected demand for limestone from the Ranch Springs Property, even though much of this population lived outside the 40–50 mile radius.

- On the basis of its assumptions about population growth, AFI estimated that limestone demand in the relevant market would increase by 440,217 tons (in toto) during the 10-year period ending in 2025. But AFI projected total production from the Ranch Springs Property during this period of 5.755 million tons, or 13 times the estimated additional demand.

- Mr. Wick assumed that a hypothetical quarry on the Ranch Springs Property would serve a market within a 30-mile radius. Given the high cost of transporting aggregates, this assumption is more plausible than AFI's assumption of a 40–50 mile radius. But Mr. Wick assumed that the hypothetical quarry, beginning in year 5, would capture *100%* of the new demand in Shelby County every year for the ensuing 23 years. Given the unused capacity of the 16 existing nearby quarries, this assumption was unreasonable.

- Petitioner's experts projected that large-scale production would begin almost immediately, even though the Ranch Springs Property was a greenfield site with no existing entitlements. AFI assumed that 700,000 tons of limestone would be extracted and sold annually after a one-year ramp-up period. Mr. Clark assumed (somewhat more conservatively) that production would begin after two years. Mr. Wick assumed (less conservatively) that production of 100,000 tons would begin in year 1. Given likely opposition to rezoning and the time required to a secure numerous permits—the White Rock saga is telling—we find these projections wildly optimistic. And given the time value of money, deferring the mining income to future years would significantly change the output of the DCF model.

B. *Value of the Easement*

The "before and after method" equates the value of a conservation easement to the diminution in value suffered by the property that is encumbered by the easement. To calculate this amount we must subtract from the "before value" of the property—here, raw land—the "after value" of that same property. We have determined that the "before value" of the Ranch Springs Property on the date the easement was granted was $720,500. Petitioner has stipulated that its "after value" was $385,000, as determined by Mr. Sheppard. The value of the conservation easement was thus $335,500.

Petitioner's contention that the value of the easement exceeded $25 million is premised on its assertion that the Ranch Springs Property was worth $26,034,064, or $236,673 per acre, before the easement was granted. But petitioner does not seriously contend that a knowledgeable willing buyer—say an experienced mine operator—would have paid $236,673 per acre for the Sun Valley Tract in December 2017. Indeed, Lhoist—the ninth largest aggregates producer in the United States—in 2014 acquired 240 acres of mining property in Calera for an average price of only $16,667 per acre. *See supra* p. 14. Under the "principle of substitution," a knowledgeable buyer would not pay $236,673 per acre to purchase these 110 acres when it could obtain substantially equivalent land for a tiny fraction of that price.

At the end of the day, petitioner's position appears to rest on its assertion that the "willing buyer/willing seller" test, which governs the valuation of property for charitable contribution purposes generally, does not apply when the donated property is a conservation easement.

Petitioner cites no judicial precedent or other authority to support this novel proposition. There is none.

The regulations provide that the FMV of property for charitable contribution purposes is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 1.170A-1(c)(2). "This definition, a fixture in the Treasury Regulations since 1972, is universally acknowledged by professional appraisers when valuing charitable contributions of property." *Seabrook Prop.*, T.C. Memo. 2025-6, at *35 (quoting *Corning Place*, T.C. Memo. 2024-72, at *27). Mr. Clark, who prepared the appraisal attached to Ranch Springs's return, cited this definition as the applicable test.

In dozens of cases dating back many decades, this Court has cited the "willing buyer/willing seller" test as the governing standard in determining the FMV of conservation easements. *See, e.g.*, *Boltar*, 136 T.C. at 336; *Hilborn*, 85 T.C. at 688; *Anselmo v. Commissioner*, 80 T.C. 872, 880 (1983), *aff'd*, 757 F.2d 1208 (11th Cir. 1985); *Seabrook Prop.*, T.C. Memo. 2025-6, at *35–36; *Corning Place*, T.C. Memo. 2024-72, at *27. The Eleventh Circuit, to which appeal of this case presumably lies, has done the same. *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1370 (11th Cir. 2021); *Anselmo v. Commissioner*, 757 F.2d at 1212–13. Petitioner has cited no appellate authority supporting a different conclusion.

In suggesting that the "willing buyer/willing seller" definition is inapplicable here, petitioner relies on a sentence in Treasury Regulation § 1.170A-14(h)(3)(i), which addresses valuation of conservation easements. That sentence reads as follows: "The value of the contribution under section 170 in the case of a charitable contribution of a perpetual conservation restriction is *the fair market value of the perpetual conservation restriction* at the time of the contribution." *Ibid.* (emphasis added by petitioner).

According to petitioner, "the fair market value of the perpetual conservation restriction" is the value of what the donor gives up by granting the easement, i.e., the value of "the property rights sacrificed." In this case, petitioner says, the "the property rights sacrificed" consist of the right to construct and operate a limestone quarry on the land. The NPV of the hypothetical limestone quarry, petitioner concludes, is thus the FMV of the easement. On this theory, it does not matter what a

knowledgeable willing buyer would pay for the land unencumbered by the easement. The "willing buyer/willing seller" test thus goes out the window.

This argument is wholly unconvincing. The sentence on which petitioner relies functions as the preamble to Treasury Regulation § 1.170A-14(h)(3)(i). It says that "[t]he value of the contribution . . . in the case of a charitable contribution of a perpetual conservation restriction is the fair market value of the perpetual conservation restriction." If we replace "perpetual conservation restriction" with "X," this sentence says that "the value of the contribution . . . in the case of a charitable contribution of X is the fair market value of X."

This sentence, in other words, simply says that the value of the contribution is equal to the FMV of the property contributed. This is essentially a truism. What matters is *how we determine* the FMV of the property contributed, i.e., the value of the perpetual conservation restriction.

The sentence on which petitioner relies provides no help in answering the latter question, but the rest of the regulation does. It says that, if a live market for conservation easements exists, we look to data from that market to enable a *direct valuation* of the perpetual conservation restriction. Treas. Reg. § 1.170A-14(h)(3). In the absence of such data (as here), the regulation instructs us that the "before and after" method must generally be used to value that restriction. *Ibid.* In essence, this method values the easement indirectly rather than directly.

The "before and after" method instructs us to determine the FMV of the subject property—here, the undeveloped land—at two points in time: immediately before and immediately after the easement is granted. In determining the FMV of that property at each point, we are required to use the "willing buyer/willing seller" formula, as we would do in determining the FMV of any property for charitable contribution purposes. The first sentence of Treasury Regulation § 1.170A-14(h)(3)(i) does not "supersede" or render irrelevant the "willing buyer/willing seller" test. To the contrary, that regulation dictates a method—the "before and after" method—that requires use of the "willing buyer/willing seller" definition to determine the FMV of the property at both points in time.

There is no textual or logical support for petitioner's assertion that the "willing buyer/willing seller" formula, which governs the

determination of property value for charitable contributions generally, somehow does not apply when the donated property is a conservation easement. In essence, petitioner asserts that the first sentence of Treasury Regulation § 1.170A-14(h)(3)(i) mandates use of the owner-operator version of the capitalized income method when valuing a conservation easement. But the regulation cannot plausibly be interpreted to say that.

By reading this regulation to mandate use of the valuation method petitioner prefers, petitioner is begging the question. The only valuation method the regulation specifies—applicable when there is no active market for purchase and sale of conservation easements—is the "before and after" method. Petitioner does not dispute—and its expert, Mr. Clark, agreed—that the "willing buyer/willing seller" test applies in determining the *after value* of property subject to this regulation. That being so, petitioner cannot logically contend that the same regulation forecloses use of the "willing buyer/willing seller" test in determining the *before value* of the same property.

## IV. *Penalties*

The Code imposes a 20% penalty for an underpayment of tax required to be shown on a return that is attributable to "[a]ny substantial valuation misstatement." § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. § 6662(h)(2)(A)(i).[24]

The value Ranch Springs claimed for the easement on its 2017 return was $25,814,000. We have determined that the value of the easement on the valuation date was only $335,500. The claimed value thus exceeded the correct value by $25,478,500 or 7,694%. The valuation misstatement was thus "gross."

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation

---

[24] By Order served October 17, 2023, we held that the IRS satisfied the supervisory approval requirement for the penalties determined in the FPAA. *See* § 6751(b)(1). We accordingly address that subject no further here.

overstatement with respect to charitable contribution property. *See* § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* § 6664(c)(3) (first sentence). The 40% penalty thus applies to the portion of Ranch Springs' underpayment attributable to claiming a value for the easement in excess of $335,500.

Respondent also seeks a 20% penalty for an underpayment due to negligence or a substantial understatement of income tax. *See* § 6662(a) and (b)(1) and (2). This penalty would apply to the portion of any underpayment not attributable to the valuation misstatement. *See Oconee Landing*, T.C. Memo. 2024-25, at \*75 (citing *Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133). We have rejected respondent's contention that Ranch Springs is entitled to a charitable contribution deduction of zero on the theory that it failed to secure a "qualified appraisal." *See supra* pp. 31–33. Because Ranch Springs is entitled to a charitable contribution deduction of $335,500, there is no underpayment attributable to claiming a deduction in that amount, so the 20% penalty does not apply.

We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Decision will be entered under Rule 155.*